796 A.2d 90

Douglas HOLMES, Jr.

v.

STATE of Maryland.

No. 77, Sept. Term, 2001.

Court of Appeals of Maryland.

April 10, 2002.

Mary J. Pizzo, Assistant Public Defender (Stephen E. Harris, Public Defender, on brief), Baltimore, for petitioner/cross–respondent.

Kathryn Grill Graeff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent/cross–petitioner.

Argued Before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL and BATTAGLIA, JJ.

WILNER, J.

Petitioner was convicted by the Circuit Court for Baltimore City, on an agreed statement of facts, of possession with intent to distribute cocaine and marijuana and possession of a firearm in connection with a drug trafficking offense. Those convictions rested, in large part, on evidence found during a search of petitioner's home, and the issue is whether that evidence was lawfully obtained.

The search was pursuant to a warrant, but the warrant was based, in part, on information gained by the police through an earlier warrantless entry into the house. The Circuit Court concluded that the initial entry was justified by exigent circumstances and that there was probable cause to support the warrant. On appeal, the Court of Special Appeals disagreed with the finding of exigent circumstances, but remanded the case for a determination of whether the initial entry was with the consent of petitioner's father. We have a different view than either of the two lower courts, but one that will effect an affirmance of the Circuit Court judgment.

## BACKGROUND

Petitioner, to his misfortune, got snared in a police operation directed against his confederate, Brian Covell. On March 22, 1999, the police had obtained warrants to search Covell, his house at 522 Midwood Road, and his Cadillac automobile. Police agents, led by Officer James Harlee, drove to the Midwood Road home just in time to see Covell drive away in his Cadillac. They followed him to the 4500 block of Marble Hall Road, about a mile away, where Covell parked his car and entered the home of his parents at 4548 Marble Hall Road. Covell soon left the home, got into his car, and drove

off. Intending to effect a stop, the police followed but lost sight of the car as it crested a hill, so they returned to Marble Hall Road. Covell returned a few minutes later and reentered his parents' home.

About five minutes later, Harlee observed the arrival of petitioner. Petitioner parked his car, looked around in what Harlee regarded as a suspicious manner, and then went into 4626 Marble Hall Road, which was in the same block as 4548, but a half to three-quarters of a block away. Petitioner stayed only about a minute. He then came out, looked around again, got into his car, and drove away. Petitioner returned about three minutes later, got out of his car, looked around as before, reentered 4626, stayed a few minutes, then came back out and walked down to and entered 4548. After just a "couple minutes," petitioner and Covell exited the house together and walked to the corner, where they met three men. Harlee, still surveilling from the police car, observed both Covell and petitioner make a hand-to-hand exchange with the men.[1] The three men left, whereupon Covell and petitioner got into petitioner's car and drove off.

---

1. Officer Harlee's recollection regarding the transaction at the corner was challenged as ambiguous. In his application for the search warrant for petitioner's home, he said that he saw "a hand to hand exchange between [petitioner] and one of the unknown black males." In his testimony at the suppression hearing, he first mentioned a transaction involving only Covell but later made clear that both Covell and petitioner were involved in separate transactions. The Court of Special Appeals seemed "disturbed" at what it regarded as "confusion" on Harlee's part and, in its analysis, excluded any reference to the alleged hand-to-hand exchange involving petitioner. We are not so disturbed. Apart from the fact that we must take the evidence presented at the suppression hearing in a light most favorable to the State, which, as to petitioner, would have him involved in the hand-to-hand transaction, we do not see the "confusion" that seemed to disturb the intermediate appellate court. Covell and petitioner were tried together, and Officer Harlee was examined and cross-examined at the suppression hearing with respect to the conduct of both men, each defense lawyer focusing on his client. We see nothing extraordinary about Harlee's relating only Covell's activity at one point and later explaining, on cross-examination by petitioner's lawyer, that he saw both men engaged in what he regarded were drug sales. Harlee clarified several times that he saw both Covell and petitioner engaged in the hand-to-

The police stopped the car about a block away. As Officer Harlee approached, he observed in petitioner's jacket pocket a plastic bag containing plant material which, from his 21 years of police experience, he recognized as marijuana. Petitioner was arrested for possession of marijuana, and Covell was informed of the search warrants for him, his Midwood Road home, and automobile. When asked whether there were any drugs in either of the Marble Hall Road houses, petitioner refused to answer, saying only, "do what you got to do. I'm not answering that question."

Initially, the police had the two men sit on the sidewalk, but, when they noticed several people gathering up the street and watching them, they escorted Covell and petitioner back to 4626, where they were greeted at the door by petitioner's father. Officer Harlee explained that they had arrested petitioner and believed that there were drugs in the house. According to Harlee, the father consented to their entering and searching the house, but Harlee responded that he would get a search warrant and desired only to secure the house. He explained at the suppression hearing that, as the current warrants he had regarding Covell covered only Covell, the Midwood Road home, and the Cadillac, he needed a new warrant for Covell's mother's home at 4548 Marble Hall Road, and decided to obtain a warrant for 4626 as well, to avoid later challenges to the search of that house. He and several officers entered the house. One went upstairs to do a protective sweep—to see if anyone else was there—and one went downstairs for the same purpose. There was no actual search—no drawers or containers were opened and nothing was disturbed. The officer who went upstairs informed Harlee that he observed a safe in a bedroom closet. When assured that there was no one else in the house, Harlee detached two officers to remain in the house with petitioner and his father, accompanied Covell to 4548, which was also

---

hand transactions. We see no basis for excluding from the warrant application Harlee's statement that he observed petitioner involved in a drug sale.

impounded pending a warrant, and finally left to obtain the warrants.

Harlee succeeded in obtaining search warrants for both Marble Hall Road houses from a judge of the Circuit Court. He included in his application as to 4626 the fact that there was a safe in the house. He returned within two hours. The search of 4626 that ensued uncovered, among other things, over $8,000 in cash, several plastic bags containing cocaine, one containing marijuana, other paraphernalia, two handguns, a flare signal pistol, and five shotgun shells. Petitioner moved to suppress this evidence on the ground that both the initial entry, which led to the discovery of the safe, and the ultimate search were unlawful as being unsupported by probable cause. Relying largely on *Segura v. United States*, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Circuit Court concluded that the initial entry and "impoundment" of 4626 were proper and that probable cause existed for the warrant. The court credited Harlee's concern that the crowd gathered on the street "had a clear and direct opportunity to get back to those houses and destroy or remove the other evidence or have people in the houses do that." In effect, that concern justified the initial entry and impoundment, and consequently the discovery of the safe, on the ground of exigency.

The Court of Special Appeals found no prejudice from the impoundment itself, but viewed the ultimate issue of probable cause as dependent on the validity and effect of the discovery of the safe during the protective sweep that accompanied the impoundment. In that regard, it saw no evidence that the crowd of people that concerned Officer Harlee was inclined to interfere with the police investigation or destroy any evidence and, for that reason, rejected the Circuit Court's finding of exigency. The appellate court concluded that the initial entry might be sustainable on a finding of consent notwithstanding that the State never argued consent as a basis for sustaining the entry, but noted that the trial court had made no finding in that regard. It therefore remanded for consideration of that issue and, depending on the court's resolution of it,

reconsideration of whether there was probable cause for the warrant.

Neither petitioner nor the State are happy with those rulings, and both have sought review here. Petitioner raises two issues: (1) whether, in light of the prosecutor's statement at the suppression hearing that the police had been refused consent by petitioner's father and the State's reliance only on exigency as a justification for the initial entry, it was appropriate for the Court of Special Appeals to remand for a ruling on consent; and (2) if so, whether there was a sufficient nexus between petitioner's activities outside the house to generate probable cause for a search of the house. In a cross-petition, the State urges that: (1) under *Segura*, exigent circumstances are not necessary to justify impoundment of a home and a cursory protective sweep while a warrant is obtained; and (2) even if such circumstances are required, the Court of Special Appeals erred in concluding that they did not exist.

## DISCUSSION

### The Relevant Issue

The questions raised by the parties focus, for the most part, on the validity of the initial intrusion into the house, because it was from that intrusion that the police discovered the safe. The evidence actually challenged by petitioner was uncovered during the search conducted pursuant to the warrant, however, and not as a result of the protective sweep that accompanied the initial entry. The alleged illegality of the initial entry is significant only because the existence of the safe was noted in the application for the warrant and was presumably considered by the judge in finding probable cause, and thus, in petitioner's view, tainted the warrant itself. Whether there was consent to the first intrusion or whether there were, or needed to be, exigent circumstances to justify it are important only in that context.

We dealt with a similar kind of issue in *Klingenstein v. State,* 330 Md. 402, 624 A.2d 532, *cert. denied,* 510 U.S. 918, 114 S.Ct. 312, 126 L.Ed.2d 259 (1993). As part of an investi-

gation into whether Klingenstein, a pharmacist, was violating the controlled dangerous substance laws by filling forged prescriptions for two particular drugs, two search warrants were issued, one for his pharmacy and one for his home. The warrant for the pharmacy was held to be valid on its face, but limited in scope. The attack on it arose from the fact that, in executing the warrant, the police seized a number of items that allegedly were not included within the scope of the warrant.[2] Treating that warrant as a general one, Klingenstein moved to suppress everything seized, and the trial court granted that motion. The second warrant, for the home, was challenged on the basis that the application for it made several references to items seized pursuant to the first warrant and, indeed, incorporated the inventory of items seized. Because the judge had held the first warrant invalid and had suppressed everything seized pursuant to it, he concluded that the second warrant was fatally tainted, and therefore Constitutionally deficient.

On appeal directly from the suppression hearing, we agreed with the holding of the Court of Special Appeals that the suppression judge erred in suppressing everything taken pursuant to the first warrant-that the proper remedy for a scope

---

**2.** There actually was some question about the scope of the warrant. The investigation, which began based on information from informants and included some controlled purchases by undercover State troopers, focused on the filling of forged prescriptions for two drugs—Doriden and Tylenol 4—which, when taken together in particular doses, produce an effect similar to that of heroin. In the warrant, the issuing judge found probable cause to believe that those two drugs were concealed at the pharmacy. The command clause of the warrant, however, directed the officers to seize "all evidence, paraphernalia, controlled dangerous substances, and monies used in or incidental to the conduct or operation of controlled dangerous substance violations, found in or upon said premises." In the execution of the warrant, the officers, guided by an official from the Department of Health and Mental Hygiene, seized all drugs listed under Schedule II of the Controlled Dangerous Substance law plus various records and sums of money. The suppression court and, on appeal, both the Court of Special Appeals and this Court, construed the command clause narrowly, as being limited essentially to the two drugs mentioned, which is what made the problem one of the scope of the seizure rather than the facial validity of the warrant itself.

violation was the suppression of only those items that were outside the scope of the warrant. We therefore directed a remand for the trial court to sort through the items taken, determine which were within the scope and which were not, and suppress only those that exceeded the scope of the warrant. *Klingenstein, supra,* 330 Md. at 414–15, 624 A.2d at 538–39.

With respect to the second warrant, we concluded, based on *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), *United States v. Karo,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530 (1984), and *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), that "tainted information in the warrant application does not necessarily render the warrant unconstitutional." *Klingenstein, supra,* 330 Md. at 414, 624 A.2d at 538. *See also State v. Mazzone,* 336 Md. 379, 399, 648 A.2d 978, 987 (1994). The Court of Special Appeals, which had reached the same conclusion, had gone further and found that the reference in the application to the Schedule II drugs seized under the first warrant was not an indispensable component of probable cause, and that the remaining untainted information established probable cause for the warrant. *See State v. Klingenstein,* 92 Md.App. 325, 362, 608 A.2d 792, 810 (1992). We noted, however, that, when a motion to suppress evidence seized under a warrant is based on the lack of probable cause for issuance of the warrant, the matter is initially for the hearing judge, and that it therefore followed "that the culling of tainted information and the determination of whether the remaining untainted information is adequate to show probable cause is also a matter for the hearing judge in the first instance." *Klingenstein, supra,* 330 Md. at 414–15, 624 A.2d at 538. We continued:

"The further proceedings on remand to the circuit court should be to that end, not strictured by a culling by the appellate court and a holding by it that the remaining untainted information was adequate. If the hearing judge concludes, after factoring out the tainted information, that the information remaining established probable cause for the issuance of the warrant, he should, of course, uphold it

and deny the motion to suppress insofar as it is founded on the unconstitutionality of the issuance of the warrant. The appellate court will then be in a position to perform its function of making an independent constitutional appraisal of the propriety of the hearing court's rulings."

*Id.* at 415, 624 A.2d at 538–39.

This approach, of remanding a case to the trial court to make the initial determination of whether, after excising the unusable information, the remaining assertions in the application suffice to establish probable cause, appears, at least on its face, to be inconsistent with the approach taken by the Supreme Court in analogous circumstances. In *Karo, supra,* 468 U.S. 705, 104 S.Ct. 3296, 82 L.Ed.2d 530—a case cited by us in *Klingenstein*—Federal agents, alerted that certain persons had ordered several cans of ether for use in extracting cocaine from clothing shipped into the country, installed a beeper into one of the cans that was eventually sold to the defendants. In part through monitoring the beeper and in part through visual surveillance, the agents kept track of the ether cans as they were moved from one place to another, eventually ending up in a private house. Based on this surveillance and observations they made from outside the house, the agents obtained a warrant to search the house. The defendants moved to suppress the evidence seized pursuant to the warrant on the ground that the warrant was fatally tainted by the unconstitutional use of the beeper.

The Supreme Court found no Fourth Amendment violation in the initial installation of the beeper, but did find one in the monitoring of the beeper while it remained in private homes which, the Court held, was tantamount to a warrantless search of the homes. That information, it concluded, would invalidate the warrant for the house "if it proved critical to establishing probable cause for the issuance of the warrant." *Id.* at 719, 104 S.Ct. at 3305, 82 L.Ed.2d at 544. Citing *Franks, supra,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667, however, the Court also noted that "if sufficient untainted evidence was presented in the warrant affidavit to establish probable cause, the warrant was nevertheless valid." *Karo, supra,* 468 U.S. at

719, 104 S.Ct. at 3305, 82 L.Ed.2d at 544. Significantly, the Supreme Court did not remand the matter for the trial court to make that determination but undertook the task itself, holding that "[i]t requires only a casual examination of the warrant affidavit, which in relevant respects consists of undisputed factual assertions, to conclude that the officers could have secured the warrant without relying on the beeper to locate the ether in the house sought to be searched." *Id. See also U.S. v. Glinton,* 154 F.3d 1245, 1256–57 (11th Cir.1998), *cert. denied,* 526 U.S. 1032, 119 S.Ct. 1281, 143 L.Ed.2d 374 (1999) (concluding that, after excising excludable information, application for warrant sufficed to establish probable cause and sustained warrant); *State v. Revenaugh,* 133 Idaho 774, 992 P.2d 769, 774–75 (1999) (same); *State v. Vallas,* 16 Conn. App. 245, 547 A.2d 903, 909–10 (1988) (same).

The inconsistency between the *Karo* and *Klingenstein* approaches may be more facial than real. In *Karo,* the record before the Supreme Court allowed it to determine, with precision, the information that had to be excluded and thus the untainted information that was left. The Court could then make its traditional Constitutional appraisal of whether the remaining untainted information sufficed to establish probable cause for the warrant. That was not so clearly the case in *Klingenstein.* There, a detailed culling process needed to be performed. A court would be required (1) to consider each of the items seized pursuant to the first warrant, (2) to determine whether the item was or was not within the scope of the first warrant, (3) if it concluded that the item was wrongfully seized, to determine whether and to what extent it was mentioned in and may have materially tainted the application for the second warrant, (4) if the item was mentioned in and tainted the second warrant's application, to excise it, and then (5) to determine whether, absent all of the excised items, there remained sufficient facts alleged in the application to establish probable cause for the second warrant.

It was clear from our conclusion (and that of the Court of Special Appeals) regarding the first warrant that the culling would have to be done by the suppression court. Neither

appellate court was in a position to determine from the record which items were properly seized and which were not. Indeed, the Court of Special Appeals noted that "it is difficult from our vantage point to predict precisely the value of the evidence recovered in the search of the pharmacy or to assess the precise nexus between it and the command clause of the warrant." *Klingenstein, supra,* 92 Md.App. at 336, 608 A.2d at 797. Absent that information, which, in large part, was factual in nature, we were reluctant to determine, as a matter of law, the effect on the second warrant of excising consideration of items that were improperly seized pursuant to the first warrant when it was impossible for us to determine what those items were.

That difficulty does not concern us in the present case. Here, the sole alleged taint arising from the first intrusion was the discovery and mention of the safe in the bedroom closet. We know precisely what would have to be excised should that intrusion be declared invalid, and we can quite easily determine, as part of our Constitutional appraisal of the ultimate issue, whether, without that reference, the application suffices to establish probable cause. If, upon that appraisal, we conclude, as we shall, that, even without any reference to the existence of the safe, the application suffices to establish probable cause for the warrant, the validity of the initial intrusion becomes irrelevant. The challenged evidence would be admissible as properly seized under the warrant, and there would be no need to wander through the thicket of sub-issues implicit in the issues of consent and exigent circumstances.

### *Validity of the Warrant Absent Reference to the Safe*

The affidavit attached to the application for the search warrant, for both 4548 and 4626 Marble Hall Road, was made by Officer Harlee who, in the introductory paragraphs, attested to his extensive experience and expertise in the detection and investigation of controlled dangerous substance offenses. As petitioner conceded Officer Harlee's expertise below, we need not recount those assertions. Harlee stated that, while surveilling 4548, which he knew to be Covell's mother's home, he observed Covell enter the home and then saw five men go

to that location, stay for short periods of time, and then leave. Covell then left in his car but returned moments later. Harlee then saw two other men go to 4548, stay a few minutes, and leave. After a short period of time, Covell met with petitioner, whom Harlee had seen on two previous occasions park his car a block away and walk to and enter 4626. Petitioner, he said, had acted suspiciously on both occasions by looking around to see if anyone was following him. Covell and petitioner then met either two or three other men at the corner, where Harlee observed a hand-to-hand exchange between petitioner and one of the men. Based on his experience, Harlee expressed the belief that those activities indicated narcotics transactions at both 4548 and 4626 Marble Hall Road.

Harlee continued that Covell and petitioner then got into a 1987 Chevrolet and attempted to leave the area but were stopped. He recounted that recovered from Covell was a "large sum of money"; recovered from petitioner was a "large sum of money and a large quantity of marijuana." The affidavit then notes the securing of petitioner's home, "While securing 4626 Marble Hall Road a safe was observed in the upstairs bedroom in plain view. Your affiant believes based on his expertise and training that a large amount of money and drugs are being kept in the safe." Also from his experience, Harlee stated that he knew drug traffickers often maintain large amounts of money at their residence in order to finance their operations, as well as drugs, paraphernalia, weapons, and various books, records, and other documents relating to the ordering, transportation, and distribution of controlled dangerous substances. Harlee stated that a check of Baltimore City Police Department records revealed some involvement by petitioner, during 1992 and 1993, in four controlled dangerous substance violations, in addition to charges for murder, reckless endangerment, arson, and two handgun violations. It was on this information, for our purposes, that the warrant rested.[3]

---

3. The application also stated that Harlee had received information from a reliable confidential source of narcotic activity involving petitioner

With the possible exception of "due process," there is probably no two-word term in American law that has produced as much confusing commentary as "probable cause," largely because it has such a roving context. As a predicate for the issuance of a search warrant, it simply means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527, 548 (1983); *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675, 682 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998). In making that judgment, the issuing court and any reviewing court looks at all of the relevant information lawfully included in the application and its attachments.

Here, petitioner views the evidence bearing on probable cause as simply his going in and out of his house, looking around, talking to some neighbors on the corner, and eventually having been found in possession of some marijuana. That is far too sterile an assessment of the evidence, however. Going in and out of one's own house and looking around, even in a suspicious manner, does not, of itself, give rise to probable cause, and no one in this case has ever claimed otherwise. Petitioner overlooks entirely the incriminating venture observed by Officer Harlee at the end of the block, where both he and Covell were observed in hand-to-hand transactions that Harlee reasonably concluded, under the circumstances, were drug sales, and the cumulative import of that transaction, petitioner's possession of a quantity of marijuana and money immediately afterward, and the fact that he was in and out of his house immediately prior to engaging in the drug sale. The ultimate issue in this regard is one of nexus: could a neutral magistrate—the issuing judge—reasonably infer from these observations that drugs and other evidence of controlled dangerous substance violations was likely to be found in petitioner's home?

---

and Covell, but, upon Harlee's admission at the suppression hearing that that statement was "missing a paragraph" regarding the specific information that the informant relayed to Harlee, the court disregarded it.

We dealt with aspects of this issue in *Mills v. State*, 278 Md. 262, 363 A.2d 491(1976) and *State v. Ward*, 350 Md. 372, 712 A.2d 534 (1998), both involving the search of a house for weapons, rather than for drugs. Mills was accused of kidnapping two women and raping and robbing one of them, offenses that he carried out by threatening the victims with a large hunting knife that the victims were able to describe in some detail. When he was arrested on a public street the day after the offenses were committed, Mills did not have the knife in his possession, and the police, believing that the knife would likely be in his home, obtained a warrant to search his house for the weapon. The weapon was found, Mills was convicted, and, on appeal, he contested the validity of the warrant, claiming that the affidavit, based almost entirely on the fact that the weapon described by the victims was not in his possession when he was arrested, failed to establish probable cause to believe that the weapon would be found in his home. Citing a number of Federal and State decisions, we concluded that a reasonable inference could be drawn from the facts that a specifically described weapon was used and that Mills was not in possession of it when captured the next day, that it likely might be found in his house, and we therefore sustained the warrant. Citing *Jones v. United States*, 362 U.S. 257, 270–71, 80 S.Ct. 725, 736, 4 L.Ed.2d 697, 708 (1960), we confirmed that, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates ... probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Mills, supra,* 278 Md. at 280, 363 A.2d at 501.

*Ward, supra,* was to the same effect. Two days after Alfred Stewart was shot and killed on a public street, Ward, identified as the killer by some anonymous callers, was arrested, and, along with his car, was taken to the police station for questioning. He was unarmed at the time. After questioning, he was released, but his car was impounded because of expired license tags. Following a further positive identification, the police obtained warrants to search Ward's car and

home, and from the car, incriminating evidence was recovered. The attack on the warrant for the residence centered on the reasonableness of the police expectation that the murder weapon would likely be found there.[4]   From the facts that Ward had several past handgun violations and that the witnesses who first called had, out of fear, refused to identify themselves, we held that a neutral magistrate could reasonably conclude that Ward was a person likely to possess a handgun and would not likely dispose of it.   From the further facts that Ward did not have such a weapon on him when he was first arrested within 48 hours after the murder and that one was not seen in his car, we held that a neutral magistrate could also reasonably infer that the weapon could be found either in his home or secreted in his car.   Relying on *Mills* and a number of out-of-State cases, we determined that the case was one of those "doubtful or marginal cases" spoken of in *Jones* and *United States v. Ventresca,* 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965), that " 'should be largely determined by the preference to be accorded to warrants.' " *Ward,* *supra,* 350 Md. at 389, 712 A.2d at 542 (quoting *Ventresca,* *supra,* 380 U.S. at 109, 85 S.Ct. at 746, 13 L.Ed.2d at 689).

*Mills* and *Ward* approached the nexus issue in terms of pure deductive reasoning: a particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested shortly after the crime, the defendant was not in direct possession of the weapon; *ergo,* it was likely to be found in a place accessible to him—his home or car.   That same kind of deductive approach, based on reasonable factual assumptions, has been used by a number of courts in finding a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be found in the defendant's car or home.   The reasoning, supported by both

---

4.   The record in *Ward* indicates that no incriminating evidence was uncovered from the home and that, at the trial level, the focus was on the car, from which several bullets were taken.   Nonetheless, we specifically addressed the validity of the warrant for the home.

experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.

■ Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items. *See,* for example, *United States v. Feliz,* 182 F.3d 82 (1st Cir.1999), *cert. denied,* 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000); *United States v. Cruz,* 785 F.2d 399 (2d Cir.1986); *United States v. Hodge,* 246 F.3d 301 (3d Cir.2001); *United States v. Williams,* 974 F.2d 480 (4th Cir.1992); *United States v. McClellan,* 165 F.3d 535 (7th Cir.1999); *United States v. Riedesel,* 987 F.2d 1383 (8th Cir.1993); *United States v. Terry,* 911 F.2d 272 (9th Cir.1990); *United States v. Reyes,* 798 F.2d 380 (10th Cir.1986) (but see *United States v. Nolan,* 199 F.3d 1180, 1184–85 (10th Cir.1999), sustaining warrant under *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) rather than resolving probable cause issue); *United States v. Thomas,* 989 F.2d 1252 (D.C.Cir.1993); *Vallas, supra,* 16 Conn.App. 245, 547 A.2d 903; *State v. Conway,* 711 P.2d 555 (Alaska App.1985). The thrust of those decisions was characterized by the court in *Thomas,* in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, *if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence." Thomas, supra,* 989 F.2d at 1255 (emphasis added).

■ We stress the last clause of that pronouncement to make clear that the mere observation, documentation, or suspicion of a defendant's participation in criminal activity will not necessarily suffice, by itself, to establish probable cause that inculpatory evidence will be found in the home. *See*, for example, *Yancey v. State*, 345 Ark. 103, 44 S.W.3d 315, 321 (2001) (observation of defendants watering 18 marijuana plants in the woods five to six miles from their homes did not establish probable cause that inculpatory evidence would be found in their homes); *United States v. Lalor*, 996 F.2d 1578, 1582–83 (4th Cir.1993) (without evidence that drugs might be stored at defendant's residence or geographic distance between residence and drug transaction, probable cause to search residence was lacking); *People v. Kazmierski*, 25 P.3d 1207, 1212 (Colo.2001) (direct evidence of drug activity at location to be searched required where illegal activity consisted of the manufacture of drugs, "a crime requiring a location"); *State v. Kahn*, 555 N.W.2d 15, 18 (Minn.Ct.App.1996) (refusing to permit possession of one ounce of cocaine to give rise to probable cause to search residence more than 75 miles away). There must be something more that, directly or by reasonable inference, will allow a neutral magistrate to determine that the contraband may be found in the home.

■ We need not determine whether an isolated drug transaction, especially if it were to occur some considerable distance from the home, will suffice, because here there was additional evidence connecting the transaction to the home. The transaction observed by Officer Harlee occurred less than a block from petitioner's home. Petitioner, who had a history of controlled dangerous substance violations, was in and out of his house immediately prior to meeting his customer, was in confederation with Covell, another known drug violator (for whom the police already had search warrants), and was found with a quantity of marijuana and money on him even after the transaction. At the very least, this would fall within the realm of a marginal case in which, under *Jones* and *Ventresca*, deference must be given to the warrant. We hold that, even after excising any reference to the safe, the application suf-

ficed to establish probable cause for the warrant and, because the incriminating evidence was properly discovered and seized pursuant to the warrant, it was not subject to suppression and was properly admitted.

JUDGMENT OF THE COURT OF SPECIAL APPEALS VACATED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY; COSTS IN THIS COURT AND COURT OF SPECIAL APPEALS TO BE PAID BY PETITIONER.