805 A.2d 1186

**STATE of Maryland**

v.

**Victor COLEY.**

**No. 180, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Aug. 28, 2002.

504

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore and Jack Johnson, State's Atty. for Prince George's County of Upper Marlboro, on the brief), for Appellant.

Gary Rosch, Bethesda, for Appellee.

Argued before MURPHY, C.J., and SALMON and KENNEY, JJ.

KENNEY, Judge.

The State appeals the decision of the Circuit Court for Prince George's County granting Victor Leon Coley's ("Coley") motion to suppress evidence recovered as a result of a search warrant. The State presents the following question:

> Did the circuit court err in granting Coley's motion to suppress evidence where (1) there was probable cause to justify the warrant to search Coley's residence, and (2) the officers relied on the warrant in good faith?

For the reasons set forth below, we reverse the decision and remand the case to the circuit court for further proceedings consistent with this opinion.

## Factual and Procedural Background

On October 17, 2001, Trooper A.L. McClendon ("Trooper McClendon" or "TFC. McClendon") of the Maryland State Police Drug Enforcement Command applied for the search warrant at issue.[1] Because the affidavit recites the facts leading to the issuance of the search warrant, we reproduce part of it: [2]

> IN SEPTEMBER 2001, I, TFC. MCCLENDON, WAS CON-
> TACTED BY CPL. M. MCDONOUGH IN REFERENCE TO
> ASSISTING HIM WITH CONTROLLED PURCHASES IN
> THE AREA OF PRINCE GEORGES COUNTY, MARYLAND.
> CPL. MCDONOUGH ADVISED ME THAT HE HAS A CONFI-
> DENTIAL INFORMANT (HEREINAFTER REFERRED TO
> AS CI) [3] WHO WOULD ASSIST WITH THE PURCHASES OF
> CDS.[4]
>
> MCDONOUGH–ADVISED ME THAT THE TARGET OF
> HIS INVESTIGATION IN PRINCE GEORGES COUNTY IS
> COLEY, VICTOR AND CURRENTLY RESIDES IN THE LAR-
> GO AREA OF THE COUNTY. THE CI HAS KNOWN COLEY
> FOR A LONG PERIOD OF TIME AND HAS PERSONAL
> KNOWLEDGE THAT COLEY DISTRIBUTES CDS (CRACK
> COCAINE, SCHEDULE II).
>
> THE FOLLOWING INFORMATION WAS OBTAINED ON
> COLEY UTILIZING THE COMPUTER SYSTEMS AND
> INFORMATION OBTAINED FROM THE CI:

---

1. Corporal M. McDonough ("Corporal McDonough" or "CPL. McDonough") of the Prince George's County Police Department was the co-affiant to Trooper McClendon's affidavit supporting the search warrant application.

2. The affidavit accompanying the search warrant application contained a full two-page history of the experience of Trooper McClendon and Corporal McDonough. The circuit court recognized their experience on the record, stating, "There is no disputing the experience of the affiant(s)."

3. "Confidential Informant" is often abbreviated as "CI." An informant is defined as "any individual expecting or requiring money and/or legal favor in exchange for information needed in an investigation." Maryland State Police Patrol Manual, § 11–1(a).

4. "CDS" is the commonly used abbreviation for "controlled dangerous substances."

COLEY, VICTOR LEON M/B/10-05-62

2005 E. WILSON PLACE, LANDOVER, PRINCE GEORGES COUNTY, MARYLAND 20785
6' 02, 210, SSN [ ]
SID [ ], FBI [ ]

| DATE | AGENCY | CHARGE | DISPOSITION |
|------|--------|--------|-------------|
| 06/23/88 | PRINCE GEORGES CO. | DIST. OF COCAINE | GUILTY |
| 02/02/89 | PRINCE GEORGES CO. | VOP–BATTERY | GUILTY |
| 02/23/89 | M.R.D.C.C. | DIST. OF COCAINE | UNKNOWN |
| 08/21/96 | [MD.] STATE POLICE | THEFT | UNKNOWN |

BETWEEN THE DATES OF SEPTEMBER. 12 AND OCTOBER 06, 2001, I MET WITH CPL. MCDONOUGH AND THE CI, ON TWO (2) SEPARATE OCCASIONS AT A PREDETERMINED LOCATION IN PRINCE GEORGES COUNTY, MARYLAND FOR THE PURPOSES OF CONDUCTING A CONTROLLED PURCHASE. THE CI WAS SEARCHED AND FOUND FREE OF MONIES/CONTRABAND. A DRIVE–BY OF THE TARGET RESIDENCE WAS DONE AND THE CI VISUALLY POINTED OUT COLEY'S RESIDENCE AS 13206 CAPE SHELL COURT, LARGO, PRINCE GEORGES COUNTY, MARYLAND. A GOLD COLORED CADILLAC BEARING DC REGISTRATION BA 9241 WAS OBSERVED IN THE DRIVEWAY. THE CI STATED THAT COLEY HAS RESIDED ALONE AT 13206 CAPE SHELL COURT, LARGO, PRINCE GEORGES COUNTY, MARYLAND FOR A LONG PERIOD OF TIME. THE CI WAS GIVEN AN AMOUNT OF U.S. CURRENCY IN ORDER TO MAKE A PURCHASE OF CDS FROM COLEY. CONTACT WAS MADE WITH COLEY VIA THE TELEPHONE AND COLEY ADVISED THE CI TO MAKE CONTACT WITH HIM IN THE AREA OF HIS RESIDENCE, NOT AT THE RESIDENCE. YOUR AFFIANT POSITIONED HIMSELF TO OBSERVE COLEY LEAVE HIS RESIDENCE TO THE LOCATION WHERE HE WAS TO CONTACT CI. COLEY DID LEAVE THE RESIDENCE OPERATING THE GOLD CADILLAC BEARING DC REGISTRATION BA 9241 AND WAS OBSERVED BY CO–AFFIANT MCDONOUGH MAKE CONTACT WITH THE CI. COLEY THEN BECAME MOBILE WITH THE CI. SURVEILLANCE UNITS MOMENTARILY LOST VISUAL CONTACT WITH COLEY AND THE CI BUT HAD AUDIO CONTACT WITH THE CI. AFTER A SHORT PERIOD OF TIME, COLEY WAS OBSERVED BY CO–AFFIANT MCDONOUGH DROP THE CI

OFF IN AN AREA OF PRINCE GEORGES COUNTY, MARYLAND WHERE SURVEILLANCE UNITS RECONTACTED THE CI BUT COULD NOT STAY WITH COLEY. THE CI GAVE TO ME AN OFF–WHITE SUBSTANCE SUSPECTED OF BEING CRACK COCAINE THAT HE/SHE HAD JUST PURCHASED FROM COLEY. THE CI WAS AGAIN SEARCHED AND FOUND FREE OF ANY MONIES/CONTRABAND. CONTACT WITH THE CI WAS SUBSEQUENTLY TERMINATED.

I RESPONDED TO THE MARYLAND STATE POLICE COLLEGE PARK BARRACK WHERE THE SUSPECTED CRACK COCAINE WAS FIELD TESTED AND SHOWED A POSITIVE REACTION TO THE PRESENCE OF COCAINE. BEFORE THE SECOND CONTACT WITH COLEY, YOUR AFFIANT MADE A DRIVE BY OF THE TARGET RESIDENCE. YOUR AFFIANT OBSERVED THE SAME GOLD COLORED CADILLAC IN THE DRIVEWAY THAT WAS USED BY COLEY ON THE FIRST MEETING. ON THE SECOND OCCASION, THE CI WAS SEARCHED AND FOUND FREE OF ANY MONIES/CONTRABAND. THE CI MADE CONTACT WITH COLEY VIA THE TELEPHONE. SURVEILLANCE UNITS OBSERVED THE CI AND COLEY MAKE PERSONAL CONTACT IN THE AREA OF LARGO, PRINCE GEORGES COUNTY, MARYLAND. YOUR AFFIANTS OBSERVED COLEY ALONG WITH THE CI GO TO 13206 CAPE SHELL COURT, LARGO, PRINCE GEORGES COUNTY, MARYLAND. COLEY WAS OBSERVED GOING INTO THE RESIDENCE. A SHORT TIME LATER, COLEY WAS OBSERVED EXITING THE RESIDENCE AND MAKEING [sic] CONTACT WITH THE CI. CONTACT WITH COLEY AND THE CI WAS SUBSEQUENTLY TERMINATED.

I RE–CONTACTED THE CI AT A PREDETERMINED LOCATION AT WHICH TIME THE CI GAVE TO ME AN OFF–WHITE SUBSTANCE SUSPECTED OF BEING CRACK COCAINE. THE CI STATED THAT COLEY SOLD HIM/HER THE SUSPECTED CRACK COCAINE. THE CI WAS AGAIN SEARCHED AND FOUND FREE OF ANY MONIES/CONTRABAND. CONTACT WITH THE CI WAS SUBSEQUENTLY TERMINATED.

I RESPONDED TO THE MARYLAND STATE POLICE COLLEGE PARK BARRACK WHERE THE SUSPECTED CRACK COCAINE WAS FIELD TESTED AND SHOWED A POSITIVE REACTION TO THE PRESENCE OF COCAINE.

YOUR AFFIANTS KNOW THAT PERSONS ENGAGED IN THE UNLAWFUL DISTRIBUTION OF CONTROLLED DANGEROUS SUBSTANCES AND THE USE OF CONTROLLED

DANGEROUS SUBSTANCES, USE THEIR RESIDENCE AS A LOCATION TO SECRETE THEIR CONTRABAND AND AS A STORAGE LOCATION FOR THE ASSOCIATED RECORDS KEPT IN THE DRUG TRADE. YOUR AFFIANTS ARE FAMILIAR WITH THE VARIOUS RECEIPTS, LEDGERS AND DOCUMENTS FREQUENTLY USED AS WELL AS TALLY SHEETS, BALANCE RECORDS, DEBTS AND OTHER FINANCIAL ACTIVITY REGARDING CONTROLLED DANGEROUS SUBSTANCES. YOUR AFFIANTS HAVE SEIZED THESE TYPES OF RECORDS IN THE PAST AND UNDERSTANDS [sic] THE IMPORTANCE OF SUCH ITEMS IN CONCEALING THE UNLAWFUL ACTIVITY FROM DETECTION. YOUR AFFIANTS KNOW THAT THE RESIDENCE IS FREQUENTLY REVERED AS A SAFE HAVEN AMONG UNLAWFUL DISTRIBUTORS OF CDS AND AS SUCH ARE THE MOST IMPORTANT FOR THE COLLECTION OF EVIDENCE IN A CONTROLLED DANGEROUS SUBSTANCE INVESTIGATION.

YOUR APPLICANTS [sic] THROUGH THE TRAINING, KNOWLEDGE AND EXPERIENCE GAINED AS A COVERT INVESTIGATOR HAS DEVELOPED AN EXPERTISE IN CDS INVESTIGATIONS AND THEREFORE KNOWS THAT THE COLLECTION OF THIS DOCUMENTARY EVIDENCE, AS DESCRIBED BELOW, IN ADDITION TO CONTROLLED DANGEROUS SUBSTANCES IS GERMAIN [sic] IN IDENTIFYING EVIDENCE OF THE CRIMES BEING COMMITTED REGARDING CDS AND IN IDENTIFYING THE MODE OF OPERATION AND THE CO–CONSPIRATORS OF THE UNLAWFUL ACTIVITY THAT IS BEING COMMITTED IN AND ABOUT THIS RESIDENCE.

THE CI HAS PROVIDED ASSISTANCE IN OTHER INVESTIGATIONS HANDLED BY YOUR AFFIANTS. ASSISTANCE PROVIDED BY THE CI HAS RESULTED IN FELONY CHARGES BEING PLACED ON SUBJECTS AS WELL AS A LARGE SEIZURE OF CDS. THE CI HAS BEEN A DRUG USER AND IS INTIMATELY FAMILIAR WITH THE TERMINOLOGY, PACKAGING, AND THE DISTRIBUTION OF CONTROLLED DANGEROUS SUBSTANCES. INFORMATION PROVIDED BY THE CI IN THIS INVESTIGATION AND OTHER INVESTIGATIONS HAS BEEN PROVEN TO BE TRUE AND CORRECT. AT NO TIME HAS THE CI PROVIDED FALSE OR MISLEADING INFORMATION IN ANY INVESTIGATION. INFORMATION PROVIDED HAS MADE THIS CI PAST, PROVEN AND RELIABLE.

BASED UPON YOUR AFFIANTS['] TRAINING AND EXPERIENCE IN THE QUANTITIES OF CONTROLLED DAN-

GEROUS SUBSTANCES AND ITS DISTRIBUTION, YOUR AFFIANTS KNOW:

A. THAT NARCOTICS TRAFFICKERS MUST MAINTAIN ON HAND, LARGE AMOUNTS OF UNITED STATES CURRENCY IN ORDER TO MAINTAIN AND FINANCE THEIR ON–GOING NARCOTICS BUSINESS;

B. THAT TRAFFICKERS MAINTAIN BOOKS, RECORDS, RECEIPTS, NOTES, LEDGERS, AIRLINE TICKETS, MONEY ORDERS AND OTHER PAPERS RELATING TO THE TRANSPORTATION, ORDERING, SALE, AND DISTRIBUTION OF CONTROLLED DANGEROUS SUBSTANCES. THAT CONTROLLED DANGEROUS SUBSTANCES TRAFFICKERS COMMONLY "FRONT" (PROVIDE ON CONSIGNMENT) CONTROLLED DANGEROUS SUBSTANCES TO THEIR CUSTOMERS. THAT THE AFOREMENTIONED BOOKS, RECORDS, RECEIPTS, NOTES, LEDGERS, ETC, ARE MAINTAINED WHERE THE NARCOTICS TRAFFICKERS HAVE READY ACCESS TO THEM; (i.e, THEIR HOMES)

C. THAT IT IS COMMON FOR DRUG DEALERS TO SECRETE CONTRABAND, PROCEEDS OF DRUG SALES, AND RECORDS OF DRUG TRANSACTIONS IN SECURE LOCATIONS FOR READY ACCESS AND TO CONCEAL THEM FROM LAW ENFORCEMENT AUTHORITIES;

D. THAT CONTROLLED DANGEROUS SUBSTANCES TRAFFICKERS COMMONLY MAINTAIN ADDRESSES AND/OR TELEPHONE NUMBERS IN BOOKS OR PAPERS WHICH REFLECT NAMES, ADDRESSES AND/OR TELEPHONE NUMBERS OF THEIR ASSOCIATES IN THE TRAFFICKING NETWORK.

E. THAT DRUG TRAFFICKERS COMMONLY HAVE IN THEIR POSSESSION, FIREARMS, INCLUDING, BUT NOT LIMITED TO HANDGUNS, PISTOLS, REVOLVERS, RIFLES, SHOTGUNS, MACHINE GUNS, AND OTHER WEAPONS. SAID FIREARMS ARE USED TO PROTECT AND SECURE A DRUG TRAFFICKER'S PRODUCT AND PROPERTY FROM LAW ENFORCEMENT AND/OR OTHER PERSONS OF THE DRUG MILIEU.

F. THAT ELECTRONIC EQUIPMENT SUCH AS COMPUTERS, TELEX MACHINES, FACSIMILE MACHINES, CURRENCY COUNTING MACHINES, TELEPHONE ANSWERING MACHINES AND RELATED MANUALS USED TO GENERATE, TRANSFER, COUNT, RECORD AND/OR STORE THE INFORMATION DESCRIBED ABOVE [sic]. ADDITIONALLY, COMPUTER SOFTWARE, TAPES AND DISCS, AND CONTENTS THEREIN, CONTAIN THE INFORMATION GENERATED BY THE AFOREMENTIONED ELECTRONIC EQUIPMENT.

G. THAT NARCOTIC TRAFFICKERS USE DIGITAL PAGING EQUIPMENT TO ORDER CONTROLLED DANGEROUS

SUBSTANCES AND COMMUNICATE WITH ASSOCIATES IN THE TRAFFICKING NETWORK.

YOUR AFFIANTS AVER THAT BASED UPON THE ABOVE INVESTIGATION; YOUR AFFIANT'S TRAINING, KNOWLEDGE, AND PAST EXPERIENCE AS A MEMBER OF THE MARYLAND STATE POLICE, BUREAU OF DRUG AND CRIMINAL ENFORCEMENT, THAT THERE IS PROBABLE CAUSE TO BELIEVE THAT THE LAWS RELATING TO THE ILLEGAL DISTRIBUTION AND POSSESSION WITH THE INTENT TO DISTRIBUTE CONTROLLED DANGEROUS SUBSTANCES, AS HEREINBEFORE CITED, ARE BEING VIOLATED IN AND UPON SAID RESIDENCE.

The search warrant, which requested, *inter alia,* authorization to enter and search Coley's residence, to search any person found in or on the premises, and to enter and search the gold-colored Cadillac, was issued on October 17, 2001. The warrant was executed on October 18, 2001. During the search of his residence, officers found Coley in an upstairs bedroom. They found approximately 34.5 grams of crack cocaine and 7 grams of marijuana. Officers also found a stolen .38 Taurus revolver, ammunition, and $1,736 in cash.[5]

Coley was arrested and subsequently indicted on seven charges, including: possession of CDS with intent to distribute (cocaine), possession of CDS (cocaine), possession of CDS (marijuana), possession of a firearm during and in relation to a drug trafficking crime, theft under $500, possession of a firearm after conviction of a felony drug offense, and conspiracy to distribute CDS.

On February 15, 2002, Coley filed a Motion to Suppress Evidence. A suppression hearing was held on March 1, 2002, at which Trooper McClendon was the only witness. After argument from counsel, the judge asked the trooper to re-enter the courtroom, because he "wanted Trooper McClendon

---

5. The officers executing the search warrant memorialized the items seized on an "Evidence Inventory Form." According to that form, all items but one were seized in Coley's residence. Item No. 11 is listed as "Plastic baggie containing suspected crack cocaine. Located in rental veh[icle] YHD5835 center console."

to know why" his affidavit lacked probable cause. The court ruled as follows:

All right. Court has before it a motion to suppress evidence that deals with the issue of probable cause for the search warrant. The Defense counsel wishes to go beyond the bounds of the affidavit. I concluded that I cannot do that because no illegality has been alleged here.

The issue is whether or not within the four corners of the search warrant there's probable cause for the court to believe that the residence known as 13206 Cape Shell Court, Largo, Prince George's County housed controlled dangerous substances. There is no disputing the experience of the affiant.

Trooper McClendon and Corporal McDonald on page four of the affidavit, the affirmative focus on the specifics of this case. McDonald advised me, meaning Trooper McClendon, that the target of his investigation in Prince George's County is Coley, Victor currently resided in the Largo area of the County. CI known Coley for a long period of time. Has personal knowledge that Coley runs CDS, crack cocaine schedule two.

The following information was obtained on Coley utilizing the computer system and information obtained from the CI. And then it says Coley, Victor Leon, date of birth, 2005 East Wilson Place, Landover, Prince George's County, Maryland has a criminal history in terms of record. There was prior distribution of cocaine, which shows a guilty finding back in June of 1998.[6]

All right. Thus far the confidential source has not stated anything regarding specifics about the address itself. Nor does the confidential source say anything about having personal knowledge that the residence itself is being used to house or sell drugs out of. Moreover Mr. Coley's address is

---

**6.** We cannot find in the record any indication of a conviction for distribution of cocaine in 1998. We believe the motion court was referring to the prior conviction for distribution of cocaine in June of 1988.

listed, at least in the record check portion of this affidavit, as being an address other than the address on Cape Shell Court.

The affidavit begins: Between the dates of September 12 and October 6, 2001—we know now, I might add, that this search warrant focuses upon a time frame. That it was presented to [the issuing magistrate] on October the 17th, executed on October 18th. It continues. I met with Trooper McDonald to talk. So the I here will he Trooper McDonald and the CI.

CI, confidential informant, on two separate occasions at predetermined locations in Prince George's County, Maryland for the purposes of conducting a controlled purchase. The CI was searched and found free of money/contraband. A drive by the target residence was done on CI, visually pointed out Coley's residence at 13206 Cape Shell Court, Largo, Prince George's County, Maryland. A gold colored Cadillac bearing DC registration B–A–9–2–1 was observed in the drive by.

The confidential informant stated that Coley resided alone at 13206 Cape Shell Court, Largo, Prince George's County, Maryland for a long period of time. The CI was given an amount of U.S. currency in order to make the purchase of CDS.

Page five it continues. Purchase of CDS from Coley, excuse me. Contact was made with Coley via the telephone and Coley advised—the CI made contact with him in the area of his residence. Not at the residence. It's clear to this court, at this point, that there's no involvement of this residence in criminal activity at this point.

Continuing at page five. Further affiant positioned himself to observe Coley leave the residence to the location where he was to contact the CI. Coley did leave the residence operating the gold Cadillac bearing DC registration B–A–9–2–1 was observed by co-affiant McDonald making contact with the CI. Coley then became mobile with the CI. Surveillance unit momentarily lost visual contact with Coley and the CI, but had audio contact with the CI.

After a short period of time, though, Coley was observed with co-affiant McDonald drop the CI off in the area of Prince George's County, Maryland. Surveillance units re-contacted CI, but could not stay with Coley. The CI gave me a white substance suspected to be crack cocaine that he/she had just purchased from Coley. CI was again searched and found free of money, contraband and contact was subsequently terminated.

This court opines at this point that does not provide, up to this point, probable cause to believe that the residence in question housed, contained, or was involved in criminal activity regarding the distribution of any controlled dangerous substance.

The second paragraph of page five continues. I responded to the Maryland State Police College Park Barracks where the suspected cocaine was field tested and showed a positive reaction to the presence of cocaine. That obviously related to the first purported buy which was outside of the residence and was made clear by the verbiage in first paragraph of page five that contact with the CI and Coley did not occur at the residence.

Continuing. Before the second contact with Coley your affiant made a drive by of the target residence. Your affiant observed the same gold colored Cadillac in the driveway that was used by Coley in the first meeting. Even the second occasion the CI was searched and found free of any monies/contraband. The CI made contact with Coley via the telephone. Surveillance units observed the CI and Coley make certain contact in the area of Largo, Prince George's County, Maryland.

This court notes at this point in time that the contact was clearly not at the residence. Somewhere in the area of Largo, Prince George's County. Continuing.

The affidavit reads your affiant observed Coley along with the CI go to 13206 Cape Shell Court, Largo, Prince George's County, Maryland. This court opines that there's no way of determining how they went to that residence, whether it's by car, walking, whatever, but it's clear that

they were at a different location before they went to the residence.

Continuing. Coley was observed going into the residence. A short time later Coley was observed exiting the residence, making contact with the CI. There is contact with the defendant and CI after leaving the residence, the court notes.

Continuing. Contact with Coley and the CI was subsequently terminated. It's not more detail provided. The following paragraph read, I recontacted the CI at a predetermined location. It doesn't say where it's the same date or not. At this point affiant gave me an off white substance suspected of being crack cocaine. The CI stated that Coley sold him/her suspected crack cocaine. There is absolutely no indication as to where that substance was sold. He was again searched, I'm continuing my reading, and found free of any money, contraband. Contact with CI was subsequently terminated.

I, Troop[er] McClendon, responded to the Maryland State Police College Park Barracks where the suspected crack cocaine was field tested and that showed the positive reaction to the presence of cocaine. Your affiant thereafter states at the bottom of page five, your affiant knows that persons engaged in unlawful distribution of controlled dangerous substance and the use of controlled dangerous substance used their residence in Prince George's County to create their contraband and their storage for the associated records kept in the drug trade. That is general averment.

The court has read this search warrant now at least two times, and gone over it almost word by word on the record, and I cannot find any evidence that the residence known as 13206 is the subject of any detailed information that would lead this court [an] independent tribunal, so to speak, looking at this search warrant for the first time to conclude that the residence housed or contained dangerous substances. It's pure speculation.

I'm certainly not blinded to the facts that what I may suspect. Certainly not blinded to the fact that there had

been one controlled buy. It was outside the residence. It's crystal clear in this affidavit.

Secondly the same two buys is not specifically earmarked as to date. And I appreciate the fact it may not be because the police officers in question don't want to provide any details that may lead one to conclude who the identity of the confidential source, but the reality is what's lacking in the search warrant is elemental in being specific. What should have been here, I'm sure it's an oversight, is when that confidential source returned to the presence of the police after the second buy. Wherein it reads at page five I recontacted the confidential source at a predetermined location. It doesn't tell me in the statement the date. It doesn't tell me it's made in there. I certainly suspect it's immediately thereafter, but it's not stated down here. The confidential source stated that [Coley] sold him or her the suspected crack cocaine. It doesn't say that that sale occurred in the residence.

Is there probable cause for the defendant? Yes, there's probable cause to arrest the defendant, but there's not probable cause to search the residence. Accordingly this court is going to grant the motion to suppress evidence seized at the residence as it relates to this defendant. My ruling is not focused upon the co-defendant. Nobody has argued that this defendant does not have standing. In fact it's clear that he was the owner.

So that is my ruling Ms. [Prosecutor], and I wanted Trooper McClendon here to know why I ruled that way. Thank you very much.

 The State noted a timely appeal pursuant to Md.Code Ann. (1998 Repl.Vol., 2001 Supp.), § 12–302(c)(3)(i) of the Courts and Judicial Proceedings Article ("CJ").[7] Accordingly, this case has not yet proceeded to trial.

---

7. Coley argues that because "the [State] took no exception to any finding or ruling of the trial court, nor made any attempt to preserve any issue for appeal," this case "should not be considered on appeal." He points us to civil case law and a rule of civil procedure. We note,

## Procedural Analysis

In his brief, Coley chose to attack perceived procedural shortcomings, rather than to address the merits of the State's arguments. In particular, Coley argues that the State failed to place the appropriate exhibits, *i.e.*, the warrant application and affidavit, in the record before us and that, therefore, this Court cannot review the affidavit in deciding this case. These documents were not originally transmitted by the circuit court, apparently because of confusion resulting from the court's instructions that "the exhibits [are to be] returned to the State. The original search warrant will be filed in the court file." It is unclear what transpired or why the warrant file was not placed in the jacket with the rest of the proceedings, but somehow the two were separated.

On June 10, 2002, the State filed a Motion to Correct Omission in the Record, to include the warrant application and affidavit.[8] Coley opposed that motion, and we entered an order on June 26, 2002, granting it in part and denying it in part. That order states, in relevant part, that

the motion to supplement the record be granted in part and denied in part; and it is further

ORDERED that the Clerk of the Circuit Court for Prince George's County promptly transmit to this Court all of the exhibits in the possession of the Clerk that were marked for identification during the motions hearing that has resulted in this appeal; and it is further

ORDERED that the motion to supplement the record with exhibits that were marked for identification but not retained by the Clerk is DENIED *WITHOUT PREJU-DICE* to the State's right to obtain relief in conformity with

---

however, that this appeal is proper under CJ § 12–302(c), which does not require the State to object or take exception to the ruling.

**8.** In its motion, the State noted that the record provided to this Court by the Circuit Court for Prince George's County did not contain either the original or a photocopy of the search warrant application and affidavit. It requested that the record be supplemented with either the original documents or photocopies thereof.

the requirements of Md. Rule 8–413(a)[.] [Emphasis in original.]

Coley believes that this Court's order granting in part and denying in part the motion to correct omission in the record means that only the search warrant itself is properly before us. When we received the supplemental materials, all four exhibits presented at the motion hearing were included, each marked with the court reporter's original exhibit stamp. Only four items were marked as exhibits at the suppression hearing and are numbered one through four. Exhibit One is "the original of the documents referenced in two, three, four." [9] Exhibit Two is a photocopy of the original search warrant application and affidavit. Exhibit Three is a photocopy of the search warrant. Exhibit Four is the search warrant inventory report and return. The original warrant documents, Exhibit One, were intended to be kept with the court file but were apparently returned to the judge who had issued the warrant. Exhibits Two through Four were not returned to the State, apparently due to an oversight, and were placed into the original warrant file jacket given to the issuing judge.

Accordingly, Exhibit One, which includes the original warrant application and affidavit, search warrant, and return, was provided along with Exhibits Two, Three, and Four, which were also attached inside the warrant jacket filed to this Court in response to the June 26, 2002 order. [10] Therefore, because

---

9. This description was given during the hearing in response to defense counsel's question, "[W]hat's State's exhibit number one?" The State then confirmed this description of Exhibit One.

10. Even if there was merit to Coley's claims that the original search warrant application and affidavit may not be considered by this Court because of some perceived failure of the State to place those exhibits properly in the record, we note that we have a near verbatim account of the contents of the search warrant affidavit before us in the transcript of the motion hearing. The motion court was careful to identify that it was reading the affidavit "almost word by word on the record." At oral argument, Coley's counsel indicated that he had not done a word for word comparison but he had no reason to believe that the documents submitted were not the correct documents.

we have all four of those exhibits before us, the State is not, as Coley contends, arguing evidence not in the record.[11]

## Standard of Review

■■ The circuit court in this case was acting as a reviewing court when it decided the validity of the warrant. In *Illinois v. Gates,* 462 U.S. 213, 238–29, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Supreme Court stated that the "duty of a reviewing court [in cases like this one] is simply to ensure that the [issuing] magistrate had a 'substantial basis for ... [concluding]' that probable cause existed." *Gates,* 462 U.S at 238–39, 103 S.Ct. 2317. **"[Thus,] after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'"** *Gates,* 462 U.S. at 236, 103 S.Ct. 2317 (quoting *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969))(emphasis added); *see also State v. Ward,* 350 Md. 372, 398, 712 A.2d 534 (1998) (Bell, C.J., dissenting) (When considering the validity of a search warrant, "[t]he task of a reviewing court is not to conduct a de novo review of the magistrate's determination of probable cause, but only to determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." (Citations omitted.)).

■■ The task of the warrant-issuing magistrate is " 'simply to make a practical, common-sense decision' whether probable cause exists." *Birchead v. State,* 317 Md. 691, 701, 566 A.2d 488 (1989) (quoting *Gates,* 462 U.S. at 235, 103 S.Ct. 2317). Therefore, any court that reviews a magistrate's determination of probable cause does so under the "substantial

---

11. Coley also assigns error to the fact that all exhibits used at the suppression hearing were originals and those submitted to this Court are "various types of xerox copies." We note, however, that the exhibits before us appear in fact to be both the original warrant documents in addition to the photocopies used during the suppression hearing. Originals of the warrant, its application, and return bear the original signatures of the issuing judge, affiants, and state's attorney.

basis" standard. *State v. Amerman,* 84 Md.App. 461, 472–3, 581 A.2d 19 (1990). Finally, we stress that, "[a]lthough in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965) (citing *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960)). *See also Davis v. State,* 144 Md.App. 144, 152–158, 797 A.2d 84 (2002)(stating that this deferential standard of review should also be applied to no-knock provisions in search warrants).

The Court of Appeals has stated:

The Fourth Amendment of the federal constitution and its counterpart, Article 26 of the Maryland Declaration of Rights,[12] require that no search warrant shall issue without probable cause. Probable cause means a "fair probability that contraband or evidence of a crime will be found in a particular place." In determining whether probable cause exists, the issuing judge or a magistrate is confined to the averments contained within the four corners of the search warrant application.

Review of the magistrate's decision to issue a search warrant is limited to whether there was a substantial basis

---

12. "The protections of the Fourth Amendment are applicable to the State of Maryland through the Fourteenth Amendment of the United States Constitution." *State v. Collins,* 367 Md. 700, 707, 790 A.2d 660 (2002) (citing *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081(1961); *Owens v. State,* 322 Md. 616, 622, 589 A.2d 59 (1991)). The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 26 of the Maryland Declaration of Rights states: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

for concluding that the evidence sought would be discovered in the place described in the application and its affidavit.

*State v. Lee,* 330 Md. 320, 326, 624 A.2d 492 (1993) (citations omitted).

A review of the motion court's quite thorough and detailed ruling, set out *supra,* suggests that the motion court engaged in a *de novo* review of the existence of probable cause in the search warrant. The court's responsibility, however, was not to assess to its satisfaction the existence of probable cause, but, rather, to determine if the issuing magistrate's decision was supported by substantial evidence. In making that determination, the magistrate's decision is to be afforded great deference. *Birchead,* 317 Md. at 701, 566 A.2d 488; *Gates, supra.*

■ The substantial basis standard involves "something less than finding the existence of probable cause," *Amerman,* 84 Md.App. at 470–71, 581 A.2d 19 (citing *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 80 L.Ed.2d 721 (1984)), and "is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting." *Amerman,* 84 Md.App. at 472, 581 A.2d 19.

Thus, while the "clearly erroneous" test demands some legally sufficient evidence for each and every element to be proved—to wit, that a *prima facie* case be established— *Illinois v. Gates* rejected such a rigorous standard for establishing probable cause and opted instead for a "totality of circumstances" approach wherein an excess of evidence as to one aspect of proof may make up for a deficit as to another. *Illinois v. Gates,* 462 U.S. at 235, 103 S.Ct. at 2330, expressly stated that a legally sufficient or *prima facie* showing [of probable cause] is not required[.]

*Amerman,* 84 Md.App. at 473, 581 A.2d 19.

■ In reviewing a warrant under the substantial basis standard, the following must be kept in mind:

Probable cause does not suddenly spring to life at some fixed point along the probability continuum. It may arise at any number of points within a band of not insignificant width. Within that range of legitimate possibilities, the determination is as much an art form as a mathematical exercise and relies necessarily upon the eye of the beholder. One judge may give a circumstance great weight; another may give it slight weight; each is entitled to weigh for himself and neither will be legally wrong in so doing. Within proper limits, one judge may choose to draw a reasonable inference; another may as readily decline the inference; each will be correct and each is entitled, therefore, to the endorsement of a reviewing colleague. A permitted inference, after all, is not a compelled inference.

Under the circumstances, it is perfectly logical and not at all unexpected that a suppression hearing judge might say, "I myself would not find probable cause from these circumstances; but that is immaterial. I cannot say that the warrant-issuing judge who did find probable cause from them lacked a substantial basis to do so; and that is material." There is a Voltairean echo, "I may disagree with what you decide but I will defend with my ruling your right to decide it."

*Amerman*, 84 Md.App. at 463–464, 581 A.2d 19 (footnotes omitted).

Having described the appropriate deferential standard of review to be used in these cases, we examine whether the issuing magistrate had a "substantial basis" for issuing the search warrant for Coley's residence.

### Discussion

■ The State argues that the circuit court erred by granting Coley's motion to suppress, because there was probable cause to support the warrant. Coley, on the other hand, argues that the lower court did not err and there was no probable cause to search his residence. In addition, the State contends that even if probable cause was lacking, the good faith exception to the exclusionary rule applies in this in-

stance.[13] Coley counters that the good faith doctrine does not apply because the State failed to raise the issue before the motion court. Although it appears we may have discretion to address this issue, we decline to do so in light of our holding on the issue of probable cause.[14]

---

**13.** Somewhat surprisingly, this issue was not raised or addressed in the trial court. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its companion case, *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), established the good faith exception to the exclusionary rule. Under the good faith doctrine, "evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998). *Leon* set out four sets of circumstances under which suppression remains the appropriate remedy: (1) when the judicial officer issuing the warrant was misled by an affidavit that "the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) when the magistrate "wholly abandoned his judicial role;" (3) when "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' " or (4) when the warrant is facially deficient *(e.g.,* failing to particularize the place to be searched). *Minor v. State,* 334 Md. 707, 713, 641 A.2d 214 (1994).

**14.** In his concurring opinion in *Illinois v. Gates,* 462 U.S. 213, 264–65, 103 S.Ct. 2317, 2346–47, 76 L.Ed.2d 527 (1983) (White, J., concurring), Justice White indicated that, in a case where the issue is simply whether the facts support a finding of probable cause as opposed to the "novel" case that requires resolution to guide future actions of law enforcement officer's and magistrates, "it would be prudent for the reviewing court to immediately turn to the question of whether the officers acted in good faith." As pointed out by Judge Raker in *McDonald v. State,* 347 Md. 452, 470–471, 701 A.2d 675 (1997), *cert. denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998), many courts have adopted this approach and have concluded that the *Leon* good faith exception may in many instances be reached without a probable cause determination. In *McDonald,* the Court assumed, *arguendo,* that the search warrant under consideration lacked probable cause. 347 Md. at 471, 701 A.2d 675. This, too, would seem to be a case in which the issue is simply whether the particular facts presented support a finding of probable cause. As noted in *McDonald,* the ultimate question of good faith is a legal issue. 347 Md. at 470, n. 10, 701 A.2d 675 (citing *United States v. Williams,* 3 F.3d 69, 71 n. 2 (3rd Cir.1993)). The standard is objective, and not subjective, good faith, and where there is an adequate record, the good faith inquiry may appropriately be made for the first time on appeal. *McDonald,* 347 Md.

## Was there a substantial basis for
## issuing the search warrant?

In arguing that there was a substantial basis for this warrant to issue, the State asks us to consider the Court of Appeals' recent decision in *Holmes v. State*, 368 Md. 506, 796 A.2d 90 (2002), a decision the circuit court did not have the benefit of in reaching its conclusion.[15] Coley, at oral argument, posited that *Holmes* has little impact on this case.[16]

In *Holmes*, the question, as in this case, was "one of nexus: could a neutral magistrate—the issuing judge—reasonably infer from [the] observations [made in the warrant affidavit] that drugs and other evidence of controlled dangerous substance violations [were] likely to be found in [the residence]?" *Holmes*, 368 Md. at 519, 796 A.2d 90. Holmes was convicted, *inter alia*, of possession with intent to distribute cocaine. He had the misfortune of being seen with a man whom the police had under surveillance, Brian Covell, on the date the police were to arrest Covell and execute a search warrant for his residence and car. Holmes and Covell were stopped while driving in Holmes' car. A police officer observed a plastic bag containing marijuana in Holmes' pocket, and Holmes was

---

at 470, n. 10, 701 A.2d 675 (citing *United States v. Sager*, 743 F.2d 1261, 1265 (8th Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985) and *United States v. Hendricks*, 743 F.2d 653, 656 (9th Cir.1984)).

When the circuit court concluded that no probable cause existed, the State should have asked that the good faith exception to the exclusionary rule be considered. In that way, any necessary evidentiary hearing could be held in the trial court. Although the burden is on the State, the defense would have the opportunity to present evidence that might mitigate against the application of the good faith exception in accordance with the special circumstances presented in *Leon*.

**15.** The *Holmes* ruling was made on April 10, 2002. The circuit court held the suppression hearing and ruled on March 1, 2002.

**16.** As noted above, Coley, in his brief, chose to rely exclusively on procedural errors in arguing for an affirmance. At oral argument, however, he did address the merits of the State's contentions for the first time.

arrested. The police then escorted Holmes and Covell back to Holmes' residence.

The officers wished to obtain a search warrant for Holmes' residence but intended initially to secure the house by way of a warrantless entry, to which Holmes' father consented. When they secured the house, in which nothing was disturbed or opened, an officer noticed a safe. The officers memorialized in their warrant application the fact that there was a safe in the house. The warrant was issued and the subsequent search revealed, *inter alia,* several bags of cocaine and other paraphernalia.[17] *Holmes,* 368 Md. at 508–11, 796 A.2d 90.

Although *Holmes* involved drugs, the Court of Appeals, in deciding that the warrant application established probable cause, turned to two cases involving the search of residences for weapons:

*Mills [v. State,* 278 Md. 262, 363 A.2d 491 (1976) ] and *[State v.] Ward* [, 350 Md. 372, 712 A.2d 534 (1998) ] approached the nexus issue in terms of pure deductive reasoning: a particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested shortly after the crime, the defendant was not in direct possession of the weapon; *ergo,* it was likely to be found in a place accessible to him—his home or car. That same kind of deductive approach, based on reasonable factual assumptions, has been used by a number of courts in finding a nexus between observed or documented drug transactions and the likelihood that drugs or other evidence of drug law violations may be found in the defendant's car or home. The reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant,

---

**17.** It is unclear from the factual description whether these items were found in the safe or elsewhere in the house.

they are likely to be found in a place that is readily accessible to the defendant but not to others, and that the defendant's home is such a place.

**Direct evidence that contraband exists in the home is not required for a search warrant; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.** The thrust of [the aformentioned cited] decisions was characterized in [*United States v.*] *Thomas,* [300 U.S.App. D.C. 380, 989 F.2d 1252, 1255 (D.C.Cir.1993),] in a unanimous *per curiam* opinion by a panel that included now Supreme Court Justice Ruth Bader Ginsburg, that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the residence, *if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence.*"

*Holmes,* 368 Md. at 521–522, 796 A.2d 90 (some citations omitted; italicized emphasis in original; bold emphasis added). The *Holmes* Court emphasized that something more than "mere observation, documentation, or suspicion of a defendant's participation in criminal activity" is usually necessary "to establish probable cause that inculpatory evidence will be found in the home." *Holmes,* 368 Md. at 523, 796 A.2d 90.

In this case, the suppression court scrutinized the language contained in the affidavit and presented eight problems it had with the averments therein: first, the CI never stated that Coley stored drugs in or sold drugs from the residence; second, a record check on Coley revealed that Coley's address was different from the target residence; third, the first controlled buy clearly did not involve the residence; fourth, the initial contact made during the second controlled buy did not occur at the residence; fifth, the affiants do not state whether Coley and the CI went back to Coley's residence during the second buy, by walking or driving; sixth, the affidavit does not state whether the controlled buys occurred on the same date

or not; seventh, it is unclear how long it took for the affiants to re-contact the CI after the second buy, thereby inferring that the second buy may not have been controlled; finally, the court noted that the CI told the affiants that Coley sold CDS to him, but did not state that the sale occurred in the residence. This scrutiny was tantamount to requiring more than a "fair probability that contraband or evidence of a crime would be found in" Coley's residence. *Gates*, 462 U.S. at 238, 103 S.Ct. 2317.

 First, the circuit court appeared to require that the affidavit actually state that a controlled buy occurred *in* Coley's residence, or that either the CI or the affiants knew that Coley stored contraband *in* his residence. Direct statements like these are not necessary. The affiants needed only to show a reasonable basis to infer from the nature of the illegal activity that evidence of a crime would be found in Coley's residence.[18] *See Holmes*, 368 Md. at 522–523, 796 A.2d 90.

---

**18.** Whereas the circuit court required too much to show a reasonable basis for issuing the warrant, the State is urging us in the opposite direction. Here, the State is essentially asking us to conclude that the reasonable basis for concluding that relevant evidence would be found in Coley's home is the fact that Coley is a known narcotics trafficker. We acknowledge that some jurisdictions have held that there is probable cause to believe that drug dealers will keep drugs and records of the drug trade in their homes. *See United States v. Feliz*, 182 F.3d 82, 87–88, (1st Cir.1999), *cert. denied*, 528 U.S. 1119, 120 S.Ct. 942, 145 L.Ed.2d 819 (2000) (in the case of long-time drug dealers, it can reasonably be inferred that they maintain records and accounts of drug dealings in their homes); *United States v. McClellan*, 165 F.3d 535, 546 (7th Cir.1999), *cert. denied*, 526 U.S. 1094, 119 S.Ct. 1512, 143 L.Ed.2d 663, and *cert. denied*, 526 U.S. 1125, 119 S.Ct. 1781, 143 L.Ed.2d 809 (stating: " 'Our prior cases have recognized that ... *in the case of drug dealers evidence is likely to be found where the dealers live* ' ") (citation omitted, emphasis in original); *United States v. Angulo–Lopez*, 791 F.2d 1394, 1399 (9th Cir.1986) (stating that, "[i]n the case of drug dealers, evidence is likely to be found where the dealers live"); *State v. Jenkins*, 790 So.2d 626, 627 (La.2001) (*per curiam*) (citing U.S. Court of Appeals for the Seventh Circuit precedent that, "in the case of drug dealers, evidence is likely to be found where dealers live").

Maryland, however, has explicitly rejected this notion. The approach used by Maryland, the U.S. Court of Appeals for the Fourth Circuit, and other jurisdictions requires some nexus be established, even in the

The affiants stated, and the circuit court did not dispute, that, in their experience, those engaged in distributing CDS store it in their homes, which they view as "safe havens." Furthermore, during the second controlled buy, Coley was witnessed escorting the CI to his residence, which he entered alone. Coley was then seen leaving his residence to "re-contact" the CI. This could lead one to reasonably infer that Coley entered the residence to pick up the CDS, left the residence, and subsequently sold the CDS to the CI. Nevertheless, the court concluded that the entire affidavit is "pure speculation" as to whether Coley's "residence housed or contained dangerous substances." We believe that it can reasonably be inferred that the affidavit, taken as a whole, supports the inference that Coley used his residence to support his criminal activity.

Next, the circuit court pointed out that the address for Coley that was obtained by a record check was different from the 13502 Cape Shell Court address. A "past, proven and reliable" CI informed the affiants that Coley resided at 13502 Cape Shell Court ... for a long period of time." Accordingly, one could reasonably infer that the computer system may not have been updated, or that Coley maintained one "official" residence but actually resided elsewhere.

Third, the circuit court believed the first controlled buy did not involve the residence. While it is true that the first buy described in the affidavit clearly did not occur *at* the resi-

---

absence of direct evidence, between the nature of the items sought and the place where they are to be seized. *Holmes*, 368 Md. at 523, 796 A.2d 90; *United States v. Williams*, 40 Fed.Appx. 843, 844–45 (4th Cir.2002) ("The nexus between the place to be searched and the items to be seized may be established by the nature of the item and the normal inferences of where one would likely keep such evidence."); *United States v. Hargis*, 37 Fed.Appx. 656 (4th Cir.2002) (same); *Yancey v. State*, 345 Ark. 103, 44 S.W.3d 315 (Ark.2001) (probable cause that evidence will be found in defendants' homes is not established by a mere observation that defendants were watering marijuana plants more than five miles from the homes); *State v. Kahn*, 555 N.W.2d 15 (Minn.Ct.App.1996) (no probable cause to search a residence when defendant is found with one ounce of cocaine more than 75 miles from his residence).

dence, Coley was seen exiting his residence prior to contacting the CI and making the sale. Coupled with the circumstances surrounding the second buy, a reasonable person could infer that the drugs later sold to the CI were kept at the residence prior to sale.

The fourth problem the motion court had with the affidavit is similar to the third. Again, while the initial contact between Coley and the CI during the second buy did not occur at the residence, Coley was observed leaving his residence to make contact with the CI and subsequently returning to the residence with the CI.

Fifth, the circuit court noted that the affiants did not state whether Coley and the CI returned to Coley's residence during the second buy by walking or by automobile. It can easily be inferred that, whether driving or walking, Coley's intent was to return to the residence to obtain the CDS that the CI was willing to purchase. The point is that the affiants witnessed them returning to Coley's residence together prior to the buy.

Sixth, the circuit court is concerned that the affidavit does not state whether the buys occurred on the same date, but the court does explain the significance of that concern. The affidavit provides the Court with a time frame of approximately one month, and the warrant was applied for on October 17, 2001, 11 days after the last surveillance. It can reasonably be inferred that the buys occurred on different dates within the time frame provided and are indications of a present violation. The court itself noted that the dates were likely purposely omitted in order to protect the CI's identity.

Seventh, the circuit court had a problem with the fact that the affidavit did not state how long after the second buy the CI was re-contacted. Specifically, it noted that the post-buy contact could have occurred the next day or even later. But a commonsense approach to this issue would lead one to conclude that the officers were diligent in re-contacting the CI. It is common knowledge that many CIs are current or former drug users. It is reasonable to believe that the officers would

be diligent in making every effort to contact the CI immediately after the controlled buy for a number of reasons, including the safety of the CI and the officers, as well as the desire to prevent the CI from using or selling the narcotics he or she has just purchased with money provided by an officer. The Maryland State Police Patrol Manual charges a state trooper with advising any person approved as a CI with, *inter alia,* being "subject to a search of their person and vehicle *before and after* the operation." Maryland State Police Patrol Manual, § 11–5(d), Revised 8–1–97 (emphasis added).

Finally, the circuit court noted that the CI never stated that a controlled buy occurred *in* the target residence, but it is clear that Coley was in and out of his residence before each controlled buy. The CI identified 13502 Cape Shell Court as Coley's longtime residence. This is particularly noteworthy considering the totality of the circumstances.

In *Holmes,* the nexus test was satisfied with very little, if any, direct evidence. Instead, there was adequate circumstantial evidence that, when combined with reasonable inferences generated from that evidence, would support the finding of probable cause by the issuing magistrate. We can infer probable cause based on "the type of crime," i.e., possession and distribution of CDS; "the nature of the items sought," i.e., contraband and other drug trafficking materials (usually found in a drug dealer's home); "the opportunity for concealment," i.e., most likely in a residence considering the nature of the itemization and packaging of CDS and record-keeping materials; "and reasonable inferences about where the defendant may hide the incriminating items," i.e., small packages of crack-cocaine sold to a CI under controlled buys after Coley left his home and near his home. *See Holmes,* 368 Md. at 522, 796 A.2d 90.

If, as the circuit court said, the warrant application was sufficient to support Coley's arrest, then it is sufficient to support Coley's involvement in narcotics trafficking in violation of Maryland Law. Trooper McClendon and Corporal McDonough stated that, in their experience, persons engaged

in drug law violations in Prince George's County are likely to store contraband and documents related to drug activity at their residences. Deference is to be given to the experience of police officers. Moreover, the officers used a "past, proven, and reliable" CI who proffered direct statements involving Coley's CDS distribution history and place of residence.

Furthermore, while we do not know from the affidavit exactly where or when either controlled buy occurred, we do know that Coley was seen exiting his residence prior to both controlled buys.[19] During the second controlled buy, Coley actually returned to his residence with the CI, went inside alone, re-contacted the CI outside, and then terminated contact with the CI. The CI then reported that Coley sold him crack cocaine during this period. *See Holmes,* 368 Md. at 523, 796 A.2d 90 (The fact that Holmes "was in and out of his house immediately prior to meeting his customer" was one of several factors considered in the probable cause analysis.).

Additionally, the circuit court seemed to give no weight to the fact that Coley had several prior arrests listed in the warrant application, including one conviction for distribution of CDS. *See West v. State,* 137 Md.App. 314, 350, 768 A.2d 150, *cert. denied,* 364 Md. 536, 774 A.2d 409 (2001) (numerous arrests within ten years of the issuance of the warrant are relevant to the probable cause determination); *Amerman,* 84 Md.App. at 484–85, 581 A.2d 19 (prior arrests, convictions and prior criminal reputation may be considered in probable cause analysis); *Birchead,* 317 Md. at 703, 566 A.2d 488 (suspects charged in the past with possession of CDS with intent to distribute is a factor to consider in the "totality of the circumstances" test from *Gates.*); *Malcolm v. State,* 314 Md. 221, 232–33, 550 A.2d 670 (1988) (knowledge of prior convictions is a proper consideration in determining level of probable cause).

---

**19.** As in *Holmes,* we do not "determine whether an isolated drug transaction, especially if it were to occur some considerable distance from the home, will suffice, because here there was additional evidence connecting the transaction to the home." *Holmes,* 368 Md. at 523, 796 A.2d 90.

Taken as a whole, this search warrant application does not reflect "pure speculation." Indeed, the affidavit provides a substantial basis for the issuing magistrate to believe that illegal narcotics activity was occurring in Coley's residence. Here, as in *Holmes,* "[a]t the very least, this would fall within the realm of a marginal case in which, under *Jones* and *Ventresca,* deference must be given to the warrant." *Holmes,* 368 Md. at 523, 796 A.2d 90. The issuance and execution of the search warrant involved here did not violate the Fourth Amendment or its counterpart, Article 26 of the Maryland Declaration of Rights.

**ORDER OF SUPPRESSION REVERSED AND CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**COSTS TO BE PAID BY APPELLEE.**