985 A.2d 637

**STATE of Maryland**

v.

**John FAULKNER.**

**No. 862, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Jan. 5, 2010.

38

**40**

Douglas D. Guidorizzi (Douglas F. Gansler, Atty. Gen., on brief), for Appellant.

Stanley H. Needleman (Richard W. Winelander, on brief), Baltimore, for Appellee.

Panel: DAVIS, EYLER, DEBORAH S. and ZARNOCH, JJ.

DEBORAH S., J.

In this appeal, the State challenges an order by the Circuit Court for Baltimore City suppressing evidence of narcotics

trafficking and firearm-related offenses recovered from an apartment used by John Faulkner, the appellee.[1] The State presents a single question for review, which we have re-phrased slightly:

> Did the circuit court err in granting the motion to suppress when there was a substantial basis for the issuing judge to find probable cause to issue the warrant and when, even if not, the police officers executed the warrant in good faith?

For the reasons that follow, we answer "Yes" and therefore shall reverse the suppression order and remand the case to the circuit court for further proceedings.

## FACTS AND PROCEEDINGS

The search warrant at issue here was the product of a month-long investigation by detectives with the Organized Crime Division of the Baltimore City Police Department into suspected narcotics trafficking by Faulkner. The information collected during the investigation formed the basis for an affidavit by Detectives George Davis and Mark Rutkowski ("detectives" or "affiants") in support of applications for an arrest warrant for Faulkner and five search warrants: two for vehicles used by Faulkner, one for a business owned and operated by him, and two for residential dwellings linked to him. The affidavit set forth the following relevant facts.

In early July 2007, Detectives Davis and Rutkowski began investigating suspected narcotics trafficking in certain areas of Baltimore City by a person they knew only as "Poops." A police registered confidential informant ("CI") gave the detectives information that "Poops" was selling bulk quantities of cocaine out of Jaffes Package Goods and Groceries ("Jaffes"),

---

1. Md.Code (2006 Repl.Vol., 2009 Supp.), section 12–302(c)(3) of the Courts and Judicial Proceedings Article ("CJP"), permits the State in certain criminal cases to appeal to this Court an order suppressing evidence. In such an appeal, this Court's decision must be rendered within "120 days of the time that the record on appeal is filed in the appellate court. Otherwise, the decision of the trial court shall be final." CJP § 12–302(c)(3)(iii). In this case, that date is December 12, 2009.

a store he owned and operated at 1616 E. Oliver Street. The CI also informed them that "Poops" was using a green 1994 Mitsubishi Galant with a cream colored left fender ("Mitsubishi") to transport the cocaine to various distribution points.

To verify the information from the CI, the detectives began surveillance of Jaffes. They saw a Mitsubishi matching the description provided by the CI parked in front of Jaffes; and then saw a black male approximately 5′ 8″ to 5′ 10″ tall and between 185 and 200 pounds exit the store and enter the vehicle. A check of the vehicle's license plate number revealed that Faulkner was the Mitsubishi's owner and that his registered address was 435 E. 28th Street, in Baltimore City.

The detectives met with the CI and showed him a photograph of Faulkner obtained from the Maryland Motor Vehicle Administration. The CI "immediately and without hesitation" identified the person in the photograph as "Poops." The CI said he did not know any personal information about "Poops," but he could engage in a controlled purchase of narcotics from him. The detectives decided to consider the idea after further investigation.

By entering Faulkner's name into various law enforcement databases, the detectives confirmed Faulkner's registered home address of 435 E. 28th Street. They also uncovered a second address linked to Faulkner: 5722 Plainfield Avenue, Apartment F ("the Plainfield Apartment"). They learned that on October 3, 2005, Faulkner had opened a Baltimore Gas and Electric account, which still was active, for the Plainfield Apartment. Police set up surveillance of the E. 28th Street address and the Plainfield Apartment. More than ten times in the month of July 2007, they witnessed Faulkner drive to the Plainfield Apartment in the evening between 11:00 p.m. and midnight. They concluded from these observations that Faulkner was using the Plainfield Apartment as a residence without identifying it as such.

After another meeting with the CI, police decided to move forward with a controlled buy of cocaine from Faulkner. During the third week of July 2007, the CI contacted Faulkner

to arrange a time and a location in Baltimore City for the purchase. (The precise location is not revealed in the record, presumably to protect the CI's identity.) With police in place to observe the transaction, the CI went to the agreed meeting point. Faulkner arrived in the Mitsubishi. He was accompanied by a black female in her late 20s or early 30s. The CI made a successful purchase of cocaine from Faulkner, who then drove directly to Jaffes.

Over the following weeks, police on "many occasions" observed Faulkner drive to the Plainfield Apartment after closing Jaffes. Sometimes Faulkner would leave Jaffes in the Mitsubishi. Other times, a black female with physical characteristics similar to those of the woman present at the controlled buy would arrive in a silver 1997 Audi ("Audi"), exit the vehicle, and re-enter on the passenger side to allow Faulkner to drive the car.

On one occasion, police followed the Audi to a parking area on Guilford Avenue, under the Jones Falls Expressway. Faulkner exited the vehicle carrying a dark plastic bag and entered the passenger side of a waiting Ford automobile operated by a black male. Faulkner spent several minutes in the Ford in "animated conversation" with the driver. When he exited the Ford, he no longer was carrying the plastic bag but instead was holding U.S. currency, which he placed in his pants pocket. He and the unidentified black female then drove to Jaffes. Based on the affiants' experience and training, they believed the interaction they had witnessed beneath the Jones Falls Expressway was an illegal drug transaction.

During the fourth week of July 2007, under police supervision, the CI made a second controlled purchase of cocaine from Faulkner. This time, Faulkner arrived alone at the meeting place (again undisclosed), in the Mitsubishi. After completing the sale, he drove to Jaffes.

A criminal background check of Faulkner revealed that he was arrested in 2004 on the charge of murder in the first degree "with a disposition of Criminal Jeopardy and a charge of Handgun: Use in Committing a Crime resulting in Probation Before Judgment." The affiants also noted that their

supervisor had discovered two properly documented handguns during a bar inspection of Jaffes in early 2006.

The affidavit concluded with the detectives stating their belief that Faulkner was using his person as well as Jaffes, his "observed address" at Plainfield Avenue, the Mitsubishi, and the Audi "for the illegal ... storage, transportation and concealment of controlled dangerous substances, related paraphernalia and suspected proceeds from [narcotics] sales"; and that documentation of the drug trafficking would be found at Faulkner's registered address, on E. 28th Street.

The affidavit was accompanied by statements of "expertise" for both affiants. The statement prepared by Detective Rutkowski included the following:

> As a result of the extensive knowledge gained by training, conversations, and the actual experience executing [narcotics-related] warrant[s][and] arrests, your Affiant can make certain statements relating to methods ... narcotics trafficking. *Individuals involved in the narcotic[s] trade often use numerous different addresses to facilitate and aide in the furtherance of their illegal activity.* Official documents and various personal documents and identification can verify this.

(Emphasis added.) Detective Rutkowski's statement went on to list the various types of evidence often recovered from addresses used by narcotics traffickers, including narcotics, objects used for processing and storing narcotics, U.S. currency, documents, and firearms.

On August 2, 2007, a judge in the District Court for Baltimore City, after reviewing the applications and attached documents submitted by the detectives, issued an arrest warrant for Faulkner and search warrants for Jaffes, the Plainfield Apartment, the E. 28th Street address, and the Mitsubishi and Audi automobiles. The warrants were executed on August 4, 2007. In the Plainfield Apartment, the detectives found four clear plastic bags containing what was later confirmed to be cocaine with street values ranging from approximately $300 to $2,000; several firearms, including one with an obliterated serial number; ammunition; U.S. currency stored

in a shoe box; a digital scale with suspected cocaine residue; and other items associated with the processing and packaging of cocaine. In addition, they recovered various documents listing Faulkner's name in association with that address.

The detectives also seized property from Jaffes, the E. 28th Street address, the Mitsubishi, and Faulkner himself.[2] Only the search of the Plainfield Apartment uncovered narcotics and weapons, however.

Faulkner was charged with several crimes, including possession with intent to distribute cocaine and possession of a firearm during a drug trafficking crime. He moved to suppress the evidence recovered from the Plainfield Apartment as the product of an invalidly issued warrant. At a suppression hearing on June 8, 2009, the court granted Faulkner's motion.

In so ruling, the motion judge reasoned that there was nothing in the affidavit linking Faulkner's narcotics trafficking activities to the Plainfield Apartment, and therefore the warrant for that location was not issued upon probable cause. In particular, he commented that there is nothing unusual about a person's returning to his home at night. The judge observed: "There's just nothing to show the [Plainfield Apartment] was used for drug dealing, other than we can infer. Which the law says we can't do." Further, the motion judge found the affidavit so lacking in probable cause to search the Plainfield Apartment that the police could not have relied upon it in good faith. Accordingly, the court ordered the evidence seized from that location suppressed.

We shall provide additional facts as pertinent to our discussion.

## DISCUSSION

### *"Substantial Basis" Test*

The Fourth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amend-

---

2. A key recovered from Faulkner was used to gain entry to the Plainfield Apartment.

ment, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), states that

> the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.[3]

■ The task of a judicial officer presented with a warrant application "is to reach a practical and common-sense decision, given all of the circumstances set forth in the affidavit, as to whether there exists a fair probability that contraband or evidence of a crime will be found in a particular search." *Greenstreet v. State,* 392 Md. 652, 668, 898 A.2d 961 (2006) (citing *Illinois v. Gates,* 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)); *see Patterson v. State,* 401 Md. 76, 91, 930 A.2d 348 (2007) ("Probable cause has been defined by this Court as 'a fair probability that contraband or evidence of a crime will be found in a particular place.'" (quoting *Malcolm v. State,* 314 Md. 221, 227, 550 A.2d 670 (1988))).[4]

■ When evidence has been recovered in a warrant-authorized search, it is not the task of a court ruling on a motion to suppress, or an appellate court reviewing the suppression decision on appeal, to conduct a *de novo* review of the issuing judge's probable cause decision. *State v. Jenkins,* 178 Md.App. 156, 163, 941 A.2d 517 (2008). Rather, those courts

---

3. Article 26 of the Maryland Declaration of Rights similarly guarantees that "all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted."

4. The Court of Appeals has further described probable cause as "'a nontechnical conception of a reasonable ground for belief' that the items sought will be found in the premises searched," and has noted that it "involves 'practical considerations of everyday life on which reasonable and prudent men, not legal technicians act.'" *Patterson,* 401 Md. at 91–92, 930 A.2d 348 (citations omitted).

are to determine whether the issuing judge had a "substantial basis" for finding probable cause to conduct the search. *Id.* "The substantial basis standard involves something less than finding the existence of probable cause, and is less demanding than even the familiar 'clearly erroneous' standard by which appellate courts review judicial fact finding in a trial setting." *State v. Coley,* 145 Md.App. 502, 521, 805 A.2d 1186 (2002) (internal quotation marks omitted) (citations omitted). Moreover, reviewing courts must assess affidavits for search warrants in "a commonsense and realistic fashion," keeping in mind that they "are normally drafted by nonlawyers in the midst and haste of a criminal investigation." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

In *Illinois v. Gates, supra,* the Supreme Court explained that this deferential "substantial basis" standard of review is a function of the Fourth Amendment's strong preference for searches carried out pursuant to warrants:

> [A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts. A grudging or negative attitude by reviewing courts toward warrants is inconsistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant; courts should not invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.

462 U.S. at 236, 103 S.Ct. 2317 (internal quotation marks omitted) (citations omitted). Indeed, the *Gates* Court further observed that over-scrutiny of affidavits prepared by police officers in support of warrant applications might cause them to eschew the warrant process altogether, thus increasing the perception of unlawful and intrusive police conduct. Acknowledging the difficulty in some cases of determining whether an affidavit demonstrates probable cause, the Court reasoned that the preference for warrants dictates that their validity be upheld in " 'doubtful or marginal cases.' " *Id.* at 237 n. 10, 103 S.Ct. 2317 (quoting *Ventresca,* 380 U.S. at 109, 85 S.Ct. 741).

*See also Holmes v. State,* 368 Md. 506, 521, 796 A.2d 90 (2002); *Ferguson v. State,* 157 Md.App. 580, 593, 853 A.2d 784 (2004).

■ The transcript of the suppression hearing in the case at bar reveals that the motion judge was making his own *de novo* decision as to whether there was probable cause to believe there would be evidence of drug dealing in the Plainfield Apartment. "The court's responsibility, however, was not to assess to its satisfaction the existence of probable cause, but, rather, to determine if the issuing magistrate's decision was supported by substantial evidence." *Coley,* 145 Md.App. at 521, 805 A.2d 1186. Thus, the motion court erred in deciding the issue of probable cause *de novo.* If there indeed was a substantial basis for the issuing judge's finding of probable cause, the court's error was not harmless. Therefore, we must decide the "substantial basis" question ourselves, giving preference to the validity of the warrant to the extent that this is a close case.

The State argues that the affidavit's descriptions of Faulkner's sale of illegal narcotics, his travel from Jaffes to the Plainfield Apartment in the same vehicles he used for narcotics transactions, and the surveillance and utility records linking Faulkner to the Plainfield Apartment furnished a substantial basis for the issuing judge to find probable cause to believe narcotics and weapons were being kept at the Plainfield Apartment. The State implicitly acknowledges that the affidavit contains no factual assertions directly linking Faulkner's criminal activity to the Plainfield Apartment. It maintains, however, that the totality of the circumstances establish a "common sense nexus" between Faulkner's narcotics trafficking activities and that apartment.

■ Before we can assess whether the warrant application furnished a substantial basis for the issuing judge to find probable cause to search the Plainfield Apartment, we must decide whether the detectives' statements of expertise properly were before the issuing judge as part of the warrant application. The motion judge made several comments to the effect that the statements of expertise could not be considered by the issuing judge, as they were not given under oath

(although it is unclear from the record whether that played a part in the suppression court's ruling). The statements of expertise, although part of the warrant application, were not contained within the document labeled "affidavit." Each page of the statements was initialed by the issuing judge, however, so it is clear he reviewed and considered them as part of the warrant application.

Under the "four corners" rule, an issuing judge's decision as to whether probable cause exists for a search warrant for a particular location must be made solely from the contents of the affidavit submitted in support of the warrant request. *Collins v. State,* 17 Md.App. 376, 381, 302 A.2d 693 (1973); *Brooks v. State,* 13 Md.App. 151, 154, 282 A.2d 516 (1971); *see* Md.Code (2008 Repl.Vol., 2009 Supp.), Criminal Procedure Article, § 1–203(a)(2)(i) ("An application for a search warrant shall be: 1. in writing; 2. signed and sworn to by the applicant; and 3. accompanied by an affidavit that: A. sets forth the basis for probable cause as described in paragraph (1) of this subsection; and B. contains facts within the personal knowledge of the affiant that there is probable cause.").

In this case, for each requested warrant, the issuing judge was given an application consisting of a multi-page affidavit, signed by the detectives; exhibits; and a typed, unsigned statement of expertise for each detective, setting forth his background, experience, and areas of knowledge respecting drug trafficking. At most, the detectives' failure to label their statements of expertise as part of the affidavit or to include language in the affidavit incorporating the statements of expertise was a technical oversight. The detectives and the issuing judge understood them to be sworn statements contained within the warrant application. Indeed, the detectives referred to themselves in the statements as "affiants." [5]

In our view, given that the detectives presented the issuing judge with a sworn "application for search and seizure" war-

---

5. This case is factually distinct from *Greenstreet v. State,* 392 Md. 652, 898 A.2d 961 (2006), in which the Court held that the issuing judge

rant to which the statements of expertise, like the affidavit, were attached, and that the judge considered the statements as if they were part of the affidavit, it would exalt hypertechnicality over common sense to review the issuing judge's decision as if it had been made without the statements. *Gates,* 462 U.S. at 236, 103 S.Ct. 2317.[6]

■ We return to the central question in this appeal: Did the issuing judge have a substantial basis for finding probable cause to search the Plainfield Apartment for narcotics and weapons? The controlling Maryland case on this issue is *Holmes v. State, supra,* 368 Md. 506, 796 A.2d 90.

In *Holmes,* the Court upheld search warrants for narcotics for two houses on the same street in Baltimore City: one for Holmes's house and the other for a house owned by the parents of Brian Covell, Holmes's confederate in crime. The police had observed Holmes entering and leaving both houses shortly before he and Covell walked to a nearby corner and engaged in hand-to-hand drug sales to one or two men; and they included that information in the warrant applications for the houses.

The *Holmes* Court declined to hold, as some courts have held, that, for a search warrant to issue for a suspect's home,

---

could not disregard an erroneous date within the affidavit. There, a mislabeled date (indicating that a key event happened exactly one year before its actual occurrence) rendered the information within the affidavit stale, and "the warrant and its application [did] not provide enough inherent contradiction from which to conclude with certainty that the date was in fact simply an error." *Id.* at 673–74, 898 A.2d 961. Here, there was no error; the statements of expertise simply were not labeled "affidavit." They were, however, submitted to the issuing judge with the document labeled "affidavit" and the warrant applications. Moreover, the statements of expertise did not substantively affect the information contained in the affidavit.

6. We note, moreover, that in Maryland a judge presented by a police officer with a warrant application can take into account the officer's training and expertise even though it is not expressly referenced in the affidavit. *See, e.g., State v. Edwards,* 266 Md. 515, 525, 295 A.2d 465 (1972).

there must be direct, *i.e.,* not inferential, evidence linking the criminal acts to the home. *See, e.g., Yancey v. State,* 345 Ark. 103, 44 S.W.3d 315 (2001) (invalidating warrants to search defendants' homes for drugs after they were seen by a wildlife officer watering 18 marijuana plants in a remote wooded area five to six miles from where they lived; court concluded that one could not rationally infer from the facts in the affidavit that the homes were being used in any criminal enterprise). The Court explained:

> Direct evidence that contraband exists in the home is not required for [the] search warrant [to issue]; rather, probable cause may be inferred from the type of crime, the nature of the items sought, the opportunity for concealment, and reasonable inferences about where the defendant may hide the incriminating items.

*Holmes, supra,* 368 Md. at 522, 796 A.2d 90.

On the opposite end of the spectrum, the *Holmes* Court likewise rejected the idea that evidence of a person's mere status as a drug dealer, that is, that he is known to deal drugs, can support a reasonable inference that he will have the tools or fruits of drug dealing in his home, so as to support a finding of probable cause to search his home. *See State v. Coley,* 145 Md.App. at 527 n. 18, 805 A.2d 1186 (interpreting *Holmes* as having "explicitly rejected [the] notion" that "there is probable cause to believe that drug dealers will keep drugs and records of the drug trade in their homes" and instead "requir[ing] some nexus be established, even in the absence of direct evidence, between the nature of the items sought and the place where they are to be seized."). *Accord United States v. Frazier,* 423 F.3d 526, 533 (6th Cir.2005) (distinguishing cases in which police informants actually witnessed drug dealing activities by a suspect from those in which they merely alleged the suspect's status as a known drug dealer; and observing that "the allegation that the defendant is a drug dealer, without more, is insufficient to tie the alleged criminal activity to the defendant's residence"). *See also United States v. Schultz,* 14 F.3d 1093, 1097 (6th Cir.1994) (reasoning that an

officer's training and experience can be considered in determining probable cause but cannot "substitute for the lack of [an] evidentiary nexus" between the place to be searched and any criminal activity); *State v. Thein*, 138 Wash.2d 133, 977 P.2d 582 (1999) (holding that general assertions in a warrant application affidavit that the suspect was a drug dealer and drug dealers commonly store narcotics and related evidence where they live were not sufficient to establish probable cause).

The *Holmes* Court adopted a middle ground that probable cause to search a suspect's home can be found when there is a nexus between the suspect's criminal actions and his home sufficient to support a reasonable inference that the tools or fruits of the crime probably will be found at his home. It reasoned by analogy to *Mills v. State*, 278 Md. 262, 363 A.2d 491 (1976), and *State v. Ward*, 350 Md. 372, 712 A.2d 534 (1998), which involved search warrants for weapons in the defendants' homes. The defendants in those two cases were arrested away from their homes for crimes in which particular weapons were used, and were not in possession of the weapons when arrested. In upholding the warrants, the Court in both cases employed what it later characterized in *Holmes* as "pure deductive reasoning" to draw a reasonable inference that the weapons would be found in the homes:

[A] particular kind of weapon was used in the crime; there was evidence linking the defendant to the crime; the weapon was of a kind likely to be kept, and not disposed of, by the defendant; when arrested shortly after the crime, the defendant was not in direct possession of the weapon; *ergo,* it was likely to be found in a place accessible to him—his home or car.

368 Md. at 521, 796 A.2d 90.

The *Holmes* Court likened this "deductive approach, based on reasonable factual assumptions," *id.*, to the approach other courts have employed to find a nexus between a suspect's illegal drug activity and the probability that evidence of that activity will be found in his home. Applying the logic to the facts before it, the *Holmes* Court concluded that the issuing

judge reasonably could infer from the circumstances, including that Holmes was seen selling drugs soon after he had entered and exited his house, at a location near his house, that evidence of drug trafficking probably would be found in his home. Accordingly, there was a substantial basis for the issuing court's probable cause determination.

Likewise, in *Coley, supra,* 145 Md.App. 502, 805 A.2d 1186, this Court held that there was a substantial basis for the issuing judge's probable cause finding respecting Coley's house. There, police officers began surveilling Coley after a confidential informant told them that Coley was dealing drugs and that he lived alone at a particular address. The police had the informant call Coley, in his house, and arrange a controlled buy. Coley told the informant to meet him at a particular location. The police then watched Coley leave his house, drive his car to the location, which was near his house, and sell drugs to the informant. In a second controlled buy, Coley drove to a meeting point, picked up the informant, and drove back to his (Coley's) house. Coley went in the house alone and then came out and made contact with the informant, to whom he sold drugs. Relying upon *Holmes,* we held that, considered together, the controlled buys, the information from the informant about Coley, and Coley's record of drug trafficking crimes constituted a sufficient nexus between Coley's alleged criminal acts and his house to create probable cause that the tools or fruits of his crimes would be found there; and therefore there was a substantial basis for the issuing judge's probable cause belief that evidence of drug trafficking would be found in Coley's house.

In *Holmes* and *Coley,* there was a close-in-time and location nexus between the defendants, their residences, and the actual drug sales that made quite reasonable the inferences that the residences were being used to store drugs. Although there was no evidence in either case of drugs having been seen in the houses, or of drug sales having taken place in the houses, the Court of Appeals and this Court concluded that evidence of that sort was not required to establish probable cause and that the evidence connecting the suspect's observed illegal

drug activities to his house was a sufficient nexus for an inference that the tools and fruits of the drug activities would be present at the house.

It was not necessary in either *Holmes* or *Coley* to demarcate the outer boundaries of nexus evidence that will allow a reasonable inference that tools or fruits of a crime likely will be found in a suspect's home. Indeed, the *Holmes* Court commented that it was not addressing whether an "isolated drug transaction, especially if it were to occur some considerable distance from the home," could establish probable cause to search the suspect's home. 368 Md. at 523, 796 A.2d 90. (Likewise, in *Coley,* we declined to " 'determine whether an isolated drug transaction . . . will suffice' " to obtain a warrant for the home. 145 Md.App. at 531 n. 19, 805 A.2d 1186 (quoting *Holmes,* 368 Md. at 523, 796 A.2d 90).) The *Holmes* Court further commented that "the mere observation, documentation, or suspicion of a defendant's participation in criminal activity *will not necessarily suffice, by itself,* to establish probable cause that inculpatory evidence will be found in the home." 368 Md. at 523, 796 A.2d 90 (emphasis added).

In *Holmes,* the Court recognized that, in some jurisdictions, courts have upheld the validity of search warrants for suspects' houses based solely upon evidence that the suspect has engaged in drug dealing activity, when the nexus between that activity and his house are not as close in time or location as it was in the facts before it. The Court explained these decisions as follows:

> The reasoning, supported by both experience and logic, is that, if a person is dealing in drugs, he or she is likely to have a stash of the product, along with records and other evidence incidental to the business, that those items have to be kept somewhere, that if not found on the person of the defendant, they are likely to be found in a place that is readily accessible to the defendant but not accessible to others, and that the defendant's home is such a place.

368 Md. at 521–22, 796 A.2d 90.

The line of cases to which the *Holmes* Court was referring is typified by *United States v. Thomas,* 989 F.2d 1252

(D.C.Cir.1993).[7]  There, undercover officers purchased narcotics from Thomas on the street.  Their affidavit for a search warrant for Thomas's home did not allege that any criminal activity had occurred there but generally asserted that drug dealers often keep evidence of their trade in their homes. (The opinion does not state whether the affidavit provided information on the location of the sale relative to Thomas's home.)  The court held:

> [O]bservations of illegal activity occurring away from the suspect's residence[ ] can support a finding of probable cause to issue a search warrant for the residence, if there is a reasonable basis to infer from the nature of the illegal activity observed, that relevant evidence will be found in the residence.

*Id.* at 1255.  Although not expressly stated, the theory behind the Thomas court's holding was that a suspect's participation in drug dealing crimes, by its nature, will support a finding of probable cause to search his home because it is reasonable to believe that people actively selling drugs keep evidence of their trade in their homes.

Similarly, in *United States v. Pitts*, 6 F.3d 1366 (9th Cir. 1993), an affidavit prepared by an FBI Special Agent attesting to facts evidencing that Pitts was selling drugs, including that he had delivered cocaine to an acquaintance, was used to obtain a warrant to search Pitts's home.  The United States Court of Appeals for the Ninth Circuit upheld the denial of Pitts's motion to suppress the evidence as the product of an illegal search.  The court explained its ruling as follows:

> We require only a reasonable nexus between the activities supporting probable cause and the locations to be searched. A reasonable nexus does not require direct evidence that the items listed as the objects of the search are on the premises to be searched.  The magistrate must only con-

---

**7.**  *Thomas* is a *per curiam* decision by a three-judge panel that included now-Supreme Court Justice Ruth Bader Ginsburg.

clude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

*Id.* at 1369 (quotation marks and citations omitted).

The *Pitts* court noted that "[a] magistrate may draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense," and that "in the case of drug dealers, evidence is likely to be found where the dealers live." *Id.* (internal quotation mark omitted) (citations omitted). Accordingly, the affidavit setting forth facts demonstrating that Pitts had been observed selling drugs was adequate to support a finding of probable cause to search Pitts's home.

Precedent from the Court of Appeals for the Fourth Circuit is mostly consistent with the position espoused in *Thomas* and *Pitts*. Recently, in *United States v. Williams*, 548 F.3d 311 (4th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1922, —— L.Ed.2d —— (2009), the court remarked that it had

consistently determined that there was probable cause to support ... warrants to search suspects' residences and even temporary abodes on the basis of (1) evidence of the suspects' involvement in drug trafficking combined with (2) the reasonable suspicion (whether explicitly articulated by the applying officer or implicitly arrived at by the magistrate judge) that drug traffickers store drug-related evidence in their homes."

*Id.* at 319. Although, ultimately, the *Williams* court decided the validity of the search warrants at issue solely under the good-faith exception (discussed *infra* ), it cited several of its decisions upholding warrants under this principle.[8]

---

**8.** *See United States v. Grossman,* 400 F.3d 212, 218 (4th Cir.2005) (upholding search of residence when, under the circumstances, it was "reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key"); *United States v. Servance,* 394 F.3d 222 (4th Cir.), *vacated on other grounds,* 544 U.S. 1047, 125 S.Ct. 2308, 161 L.Ed.2d 1086 (2005) (upholding warrant to search suspect's apartment based on drug evidence recovered from his vehicle when suspect had a criminal history that included a drug offense and was observed leaving the apartment in the vehicle containing the contraband); *United States*

Decisions from other jurisdictions holding that a suspect's participation in drug trafficking, generally, will support a reasonable inference that he is keeping evidence of the crime in his home include *United States v. Hodge,* 246 F.3d 301, 306 (3d Cir.2001) (stating that it was reasonable to infer that suspect caught on the street would keep evidence in his home where "facts combine to suggest that [he] was an experienced and repeat drug dealer"); *United States v. Feliz,* 182 F.3d 82, 88 (1st Cir.1999) (concluding that it was "not . . . unreasonable for the issuing judge . . . to have relied upon her common sense, buttressed by affiant's opinion as a law enforcement officer, that [the suspect] would be likely to keep proceeds from his drug trafficking and records relating to drug transactions at his apartment" even though affidavit did not directly link suspect's drug trafficking to his apartment); *United States v. McClellan,* 165 F.3d 535, 546 (7th Cir.1999) ("[A] magistrate is entitled to draw reasonable inferences about where the evidence is likely to be kept, based on the nature of the evidence and the type of offense, and that in the case of drug dealers evidence is likely to be found where the dealers live." (quoting *United States v. Reddrick,* 90 F.3d 1276, 1281 (7th Cir.1996))); *United States v. Cruz,* 785 F.2d 399 (2d Cir.1986) (holding that probable cause existed to search drug dealer's apartment despite lack of evidence that suspect had ever used the apartment); *State v. O'Keefe,* 143 Idaho 278, 141 P.3d 1147, 1157–58 (2006) ("In the case of drug traffickers, [inferences that evidence will be kept in the home] can be reasonable given the large quantities of drugs and the addi-

---

*v. Williams,* 974 F.2d 480 (4th Cir.1992) (holding that magistrate's finding of probable cause to search suspect's motel room was fully supported by affidavit that established the suspect as a drug dealer and indicated he was residing at the motel). *But see United States v. Lalor,* 996 F.2d 1578, 1582–83 (4th Cir.1993) (holding that affidavit did not establish required nexus between suspect's drug dealing and his residence when it failed to describe "circumstances . . . indicat[ing] [drug] evidence was likely to be stored at Lalor's residence"; did not "explain the geographic relationship between [the residence and] the area where the drug sales occurred"; and there was no evidence in the record from which the magistrate could infer a geographic proximity between the locations).

tional items of property typically involved, such as customer lists, sales records, manufacturing equipment and materials, packaging, scales, weapons, and large amounts of cash.").

Returning to the case at bar, we summarize the most pertinent facts that were before the issuing judge when he made his probable cause decision about the warrant for the Plainfield Apartment:

- Faulkner was reported by a police CI to be a dealer in large quantities of drugs in Baltimore City, and to use Jaffes for that purpose.

- During the month of July 2007, Faulkner was seen by the police engaging in three drug sales in Baltimore City (not at or in front of Jaffes), two of which were controlled buys arranged by the CI.

- Faulkner drove to Jaffes after making the sales.

- Faulkner had two "home" addresses: an official one, on E. 28th Street, that was listed on his driving and other records, and a second less official one, at the Plainfield Apartment. Faulkner was seen driving from Jaffes to the Plainfield Apartment late at night ten times during July 2007.

- In the experience of Detective Rutkowski, "[i]ndividuals involved in the narcotic[s] trade often use numerous different addresses to facilitate and aide in the furtherance of their illegal activity." The detectives believed that, although some records tied Faulkner to the Plainfield Apartment, he was using that apartment instead of his home address on E. 28th Street, to make less obvious what he was doing there.

- Faulkner was using two particular vehicles (either the Mitsubishi or the Audi) to drive from the store to the Plainfield Apartment and to drive from the Plainfield Apartment to the store.

- Faulkner was using these same vehicles to transport himself to and from the locations at which he was selling drugs.

The nexus question here is whether the issuing judge, as a neutral magistrate, "reasonably could infer from these observations that drugs and other evidence of controlled dangerous substance violations was likely to be found at [the suspect's] home." *Holmes*, 368 Md. at 519, 796 A.2d 90. Applying the same deductive reasoning the Court applied in *Holmes*, we answer that question affirmatively. The evidence showed that Faulkner actively was engaging in drug selling in Baltimore City, in bulk quantities, and that the nature of those crimes required him to have locations for processing narcotics for sale and for storing the narcotics, records of drug sales, and the profits from the drug sales. Within Baltimore City, Faulkner had a place of business (Jaffes) and two homes.

Although the E. 28th Street house was his registered address, Faulkner's most consistent contact was with the Plainfield Apartment. His pattern of travel took him from Jaffes to drug transactions, back to Jaffes, and then to the Plainfield Apartment. He used the same vehicles to drive to the drug transactions, to Jaffes, and to the Plainfield Apartment. Drug sales by Faulkner were witnessed at various locations in Baltimore City but not at Jaffes, the Plainfield Address, or the E. 28th Street address. An experienced detective opined that people selling drugs in Baltimore City often maintain and use more than one address to facilitate their drug dealing activities.

Faulkner's frequent travel to the Plainfield Apartment, while not unusual in isolation, must be viewed in the context of all the circumstances. As Faulkner acknowledges, it was reasonable to believe that he was storing his illegal drugs and other items related to the drug trade at Jaffes. That does not mean, however, that it was *not* reasonable to believe that evidence of Faulkner's drug dealing would be found at the Plainfield Apartment, as well. Indeed, Faulkner's pattern of contact with the Plainfield Apartment made it just as likely that he was using that location to store contraband than it was likely that he was using Jaffes for that purpose, and made it less likely that he was using the E. 28th Street address for that purpose. (Indeed, the warrant obtained for the E. 28th

Street address did not allege that narcotics probably would be found at that home. Rather, the search warrant for that address was issued upon belief that records of Faulkner's drug trade, not contraband, would be found at that official home.)

To be sure, the linkage between the Plainfield Apartment and Faulkner's drug selling activities is not as close in location or time as the linkages between the defendants' drug selling activities and their houses in *Holmes* and *Coley*. The nexus is there, however, and is bolstered by the significant fact that Faulkner was using two "homes" at one time, in the same City, and was having substantial contact with the home that was not registered as his home address. Even if this case were a "close call" on probable cause, however, our task is not to decide probable cause but instead to decide whether there was a substantial basis for the issuing court's probable cause finding; and in doing so, we are to resolve a marginal case with preference to the warrant. We hold that the issuing judge had a substantial basis for finding probable cause to search the Plainfield Apartment.

### *Good Faith Exception*

Notwithstanding our determination that there was a substantial basis for issuing a search warrant for the Plainfield Apartment, we hold, alternatively, that the evidence was admissible under the good-faith exception to the exclusionary rule, and therefore should not have been suppressed even if the warrant were invalid. We described that exception in *Coley:*

> *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and its companion case, *Massachusetts v. Sheppard,* 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984), established the good faith exception to the exclusionary rule. Under the good faith doctrine, "evidence seized under a warrant subsequently determined to be invalid may be admissible if the executing officers acted in objective good faith with reasonable reliance on the warrant." *McDonald v. State,* 347 Md. 452, 467, 701 A.2d 675 (1997), *cert.*

*denied,* 522 U.S. 1151, 118 S.Ct. 1173, 140 L.Ed.2d 182 (1998). *Leon* set out four sets of circumstances under which suppression remains the appropriate remedy: (1) when the judicial officer issuing the warrant was misled by an affidavit that "the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) when the magistrate "wholly abandoned his judicial role;" (3) when "a warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;' " or (4) when the warrant is facially deficient (*e.g.,* failing to particularize the place to be searched). *Minor v. State,* 334 Md. 707, 713, 641 A.2d 214 (1994).[9]

145 Md.App. at 523 n. 13, 805 A.2d 1186 (alteration in original).

In the case at bar, the suppression court found that the warrant fell within the third circumstance outlined in *Leon, i.e.,* the affidavit was "so lacking in indicia of probable cause" that the detectives could not have reasonably relied on its validity:

> How do I find good faith by the Police when there's just nothing—I mean, if you take that logic, it would mean that in every case, every guy who has another business—and I think that's what distinguishes this case. He's got another business, which may be legitimate, or maybe dealing drugs or both, but if a guy is dealing drugs out of his business, or dealing drugs out of his car, that the officer in good faith

---

**9.** We explained the rationale behind the *Leon* good faith exception to the exclusionary rule in *Jenkins, supra:*

> The Exclusionary Rule is intended to deter unreasonable police behavior, not judicial error. The judge may have made a mistake in issuing the warrant, but the officer is not unreasonable in relying on the judge's legal judgment. Accordingly, the officer is not unreasonable in executing a judicially issued warrant and thus exclusion is not called for even if the warrant is bad.

> 178 Md.App. at 194, 941 A.2d 517; *see Sheppard,* 468 U.S. at 991, 104 S.Ct. 3424 (" 'The exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges.' " (quoting *Gates, supra,* 462 U.S. at 263, 103 S.Ct. 2317 (WHITE, J., concurring in judgment))).

can rely on a search warrant to go into the home. . . . Why can the officer rely here in good faith, aside from the fact the judge signed it.

▆▆▆▆▆ The application of the third "exemption"[10] to the good faith exception under *Leon* requires an objective assessment of a police officer's good faith reliance on the warrant:

The objective test requires that "officers, exercising professional judgment, could have reasonably believed that the averments of their affidavit related to a present and continuing violation of law, not remote from the date of their affidavit, and that the evidence sought would be likely found at [the place identified in the affidavit]." *Connelly [v. State,* 322 Md. 719, 735, 589 A.2d 958 (1991)]. The affidavit "cannot be so 'bare bones' in nature as to suggest that the issuing judge acted as a 'rubber stamp' in approving the application for the warrant." *U.S. v. Wilhelm,* 80 F.3d 116, 121 (4th Cir.1996).

\*     \*     \*

▆▆▆▆▆ A mistake in the probable cause determination is obvious if "a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon,* 468 U.S. at 922 n. 23, 104 S.Ct. at 3420 n. 23, 82 L.Ed.2d at 698 n. 23.

*Patterson, supra,* 401 Md. at 106–07, 930 A.2d 348 (first alteration in original). Whether the good faith exception applies is a question of law. *Id.* at 104, 930 A.2d 348.

In *Jenkins* we commented upon the "growing problem" of defendants attempting to "squeeze every warrant application that lacks a substantial basis into [*Leon*'s third] exemption." 178 Md.App. at 204, 941 A.2d 517. Recounting the examples of "bare bones" affidavits given by the Supreme Court in *Leon,* we noted that this exemption was intended to apply to

---

**10.** In *Jenkins,* we characterized the four circumstances in which the good faith exception to the exclusionary rule does not apply as "exemptions." 178 Md.App. at 200, 941 A.2d 517. We will continue to use that terminology here.

the "extreme circumstance" in which the affidavit consists "purely [of] conclusory statement[s] ... backed up by no further supporting data." *Id.* at 202, 941 A.2d 517. We suggested as a means to distinguish "between a bad warrant, on the one hand, and a warrant so transparently vacuous that no officer could conceivably rely upon it, on the other hand," looking to whether the affidavit " 'provided sufficient evidence to create disagreement among thoughtful and competent judges as to the existence of probable cause.' " *Id.* at 205, 941 A.2d 517 (quoting *Patterson*, 401 Md. at 109, 930 A.2d 348). We reasoned that, when a series of judges cannot agree on the existence of probable cause, as was the case in *Jenkins*, and also is true here, the warrant cannot be so obviously inadequate that a police officer could not objectively rely upon it in good faith. Indeed, if trained legal minds cannot reach a consensus on the validity of a warrant, a reasonable police officer (presumably less exposed to the vagaries of Fourth Amendment jurisprudence) should not be expected to readily identify its invalidity.

The rarity of *Leon*'s third exemption is made clear when one considers that, even in *Frazier, Schultz*, and *Yancey (cited supra )*, in which the warrants were held invalid for failing to establish probable cause, the courts nonetheless refused to apply the third exemption (or any exemption) and ruled the evidence admitted under the good faith exception. Of particular note, the *Yancey* court recognized that, "because we have a split of authority in that some courts ... justify a search of the dealer's residence when facts infer reasonable cause to believe a person is a drug dealer, we cannot say that the reasonably well-trained police officer was not acting in good faith [by relying on the warrant]." 44 S.W.3d at 326. *See also Schultz, supra*, 14 F.3d at 1098 ("[A]lthough we have held that [the officer's]'training and experience' were not sufficient to establish a nexus of probable cause between that crime and the safe deposit boxes, the connection was not so remote as to trip on the 'so lacking' hurdle.").

As was the case in its analysis of the substantial basis question, the motion court here appeared to conclude that

because the direct evidence linked Faulkner's drug dealing only to the automobiles he drove, and to Jaffes to the extent that he traveled there between drug deals, the detectives could not have in good faith relied upon a warrant to search the Plainfield Apartment. This analysis is flawed for the reasons we already have discussed. After observing Faulkner and collecting information on him for approximately one month, during which time he participated in several narcotics transactions and moved between two primary locations—his store and the Plainfield Apartment—the detectives reasonably could believe that narcotics and related evidence of drug sales would be found at the Plainfield Apartment even without having observed Faulkner dealing drugs directly from that location. Consequently, the motion court erred by not ruling the evidence at issue admissible under the *Leon* good faith exception to the exclusionary rule.

**ORDER REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**